Thomas M. RETTIG, et al., Plaintiffs,

v.

KENT CITY SCHOOL DISTRICT, et al., Defendants.

Civ. A. No. C79–2234.

United States District Court,
N. D. Ohio, E. D.

April 24, 1981.

Opinion After Trial Aug. 25, 1981.

Edward G. Kramer, Floyd J. Miller, Cleveland, Ohio, Sheridan Neimark, Nat. Soc. for Autistic Children, Washington, D. C., for plaintiffs.

McDowall & Whalen, Dennis M. Whalen, Cuyahoga Falls, Ohio, for Kent City School Dist.

William J. Brown, Atty. Gen., Gary E. Brown and Richard W. Ross, Asst. Attys. Gen., Columbus, Ohio, for Ohio State Bd. of Ed. and Franklin Walter.

Dennis J. Murphy, Alan F. Berliner, Carlile, Patchen, Murphy & Allison, Columbus, Ohio, for Ohio Ass'n for Protection.

## MEMORANDUM AND ORDER

ANN ALDRICH, District Judge.

Pending in this action is plaintiffs' Motion to File a Second Amended Complaint. For reasons stated below, plaintiffs' motion is granted in part and denied in part.

In their Second Amended Complaint, plaintiffs seek 1) to add as defendant Ms. Donna Lightel who has replaced the named defendant Kenneth Cardinal in his official capacity as Superintendent of the Kent City School District; and 2) to add a new cause of action alleging new violations of the Education of the Handicapped Act, 20 U.S.C. §§ 1401 *et seq.*, and the Rehabilitation Act of 1973, 29 U.S.C. § 794.

■ With respect to the first proposed amendment, the Court finds this substitution of parties in their official capacity to be automatic pursuant to Rule 25(d) of the Federal Rules of Civil Procedure. Therefore, the Complaint will be amended to include Donna Lightel as a defendant, in her capacity as acting Superintendent of the Kent schools.

■ Plaintiffs' second request is denied. On April 10, 1981, some ten days before the date on which this case was scheduled for trial, plaintiffs filed this motion requesting leave to add a new cause of action. Any consideration of fairness to the defendants would lead this Court to deny such a request.

■ There is, however, an even more important reason why the request must be denied. Both the Education of the Handicapped Act and the Rehabilitation Act require the exhaustion of administrative remedies prior to pursuing a civil action in the district courts. Section 615 of the Education of the Handicapped Act institutes specific procedures at the State and local levels which must be pursued. Subsection (e) of § 1415 provides as follows:

### Civil action; jurisdiction

(e)(1) A decision made in a hearing conducted pursuant to paragraph (2) of subsection (b) of this section shall be final, except that any party involved in such a hearing may appeal such decision under the provisions of subsection (c) and paragraph (2) of this subsection. A decision made under subsection (c) of this section shall be final, except that any party may bring an action under paragraph (2) of this subsection.

(2) Any party *aggrieved by the findings and decision* made under subsection (b) of this section who does not have the right to an appeal under subsection (c) of this section, and any party *aggrieved by the findings and decision* under subsection (c) of this section, shall have the right to bring a civil action *with respect to the complaint presented* pursuant to this section, which action may be brought in any State court of competent jurisdiction or in a district court of the United States without regard to the amount in controversy . . . (Emphasis added)

It is the clear intention of this provision to limit the jurisdiction of the federal district courts to a review of issues already raised in administrative hearings. This restriction on the jurisdiction of the courts reflects a congressional recognition that educational questions, such as those associated with appropriate programs for handicapped children, lie in an area in which the courts lack both specialized knowledge and special experience.

The administrative hearings in this case dealt specifically with the educational program developed for Tommy Rettig during the 1978–1979 school year. As required under Section (a)(5) of the Act, 20 U.S.C. § 1414(a)(5), this program is revised each year to meet the changing requirements of the child. Plaintiffs now ask this Court to review the new educational programs developed for Tommy Rettig in 1979–1980 and 1980–1981 without the benefit of any administrative record. This Court is not of the opinion that considerations of alleged "judicial economy" can be permitted to circumvent clear congressional intent to limit the Court's jurisdiction. This Court is sympathetic to the plaintiffs' plight; however, the limited scope of this Court's jurisdic-

tional review has been explained, on numerous occasions, to both plaintiff's counsel, and to plaintiffs. The fact that legal remedies are often slow to come does not confer jurisdiction upon this Court over the issues that plaintiffs now seek to add to their Complaint. Plaintiffs' Motion to Amend the Complaint to add a new cause of action is, therefore, denied. IT IS SO ORDERED.

### ORDER

It is Ordered and Adjudged that the State defendant immediately revise its standard, 3301–5–16(D)(5)(b) so as to comply with the federal regulation.

IT IS FURTHER ORDERED that the defendant School District conduct a multi-factored evaluation in strict compliance with 45 C.F.R. Section 121a.532. That evaluation will be incorporated in the new IEP to be formulated for the 1981–1982 school year. The Rettigs and an expert of their choice may participate in the development of that IEP.

IT IS FURTHER ORDERED that the Kent City School District provide at least one hour per week of extracurricular activities for Thomas Rettig in accordance with the new IEP.

IT IS FURTHER ORDERED that plaintiffs' request that the defendant School District be ordered to continue to provide Thomas Rettig with a free and appropriate education for seven additional years from age 22 to 29 is hereby denied.

IT IS FURTHER ORDERED that each party shall bear their own counsel fees and costs.

IT IS FURTHER ORDERED that the court's opinion and order filed on August 25, 1981 is hereby adopted as findings of fact and conclusions of law, in accordance with Rule 52, Federal Rules of Civil Procedure.

### OPINION AFTER TRIAL

This matter is before the Court following trial and presentation of evidence. In accordance with Rule 52 of the Federal Rules of Civil Procedure, the Court herewith submits its Findings of Fact and Conclusions of Law.

### PROCEDURAL HISTORY

This action, in part, is a judicial review of several administrative hearings held by the State of Ohio in accordance with provisions of the Education for All Handicapped Children Act of 1975 (EHA), 20 U.S.C. §§ 1401 et seq.

The administrative process was initiated in February of 1978 when the parents of Thomas Rettig filed a written request for an impartial due process hearing. The administrative hearing began on January 29, 1979, and continued on an interrupted schedule until its conclusion on April 4, 1979. The State-appointed Impartial Hearing Officer issued a decision on April 30, 1979, concluding that the school system was providing a free and appropriate education for Thomas Rettig.

The plaintiffs filed an appeal from this decision to the State Board of Education on May 7, 1979. The State Board of Education, on November 13, 1979, passed a resolution affirming the conclusion of the Impartial Hearing Officer. The present action was filed on November 30, 1979, essentially as an appeal from these administrative decisions pursuant to EHA and the Rehabilitation Act of 1973, 29 U.S.C. § 794.

On December 13, 1979, an amended complaint was filed naming four new defendants, including the State Board of Education, and alleging violations of the Fourteenth Amendment to the United States Constitution and the Civil Rights Act of 1871, 42 U.S.C. § 1983.

### THE ISSUES

The Court has limited this action to a review of the issues raised by agreement of the parties to the administrative hearing and the additional claims of unconstitutional denials of due process and equal protection, together with claims of State violations of the EHA. Specifically, those issues are:

I. Plaintiffs' allegation that the refusal to permit Thomas Rettig to enroll in the Kent City School District in 1971 violated his rights under the due process and equal protection clauses of the United States Constitution.

II. Plaintiffs' allegation that defendants failed to provide a free and appropriate education for Thomas Rettig, in violation of the EHA:

A. The failure to provide Thomas Rettig with a twelve-month program of special education and related services;

B. The failure to provide in-service training on effective methods of teaching autistic children;

C. The failure to provide a multi-factored evaluation of Thomas Rettig;

D. The failure to provide nonacademic and extracurricular services and activities in such a manner as to afford Thomas Rettig an equal opportunity for participation in such services and activities;

E. The failure to provide occupational therapy services to Thomas Rettig.

III. Plaintiff's allegation that the State Board of Education failed to monitor and assure compliance with the law by the special education programs offered to Thomas Rettig by the Kent City School District.

IV. Plaintiffs' allegation that the State standards relating to the issuance of final orders in an administrative appeal violate the EHA on their face and in their application.

## FINDINGS OF FACT

Plaintiff Thomas M. Rettig is a sixteen-year-old male child who is severely handicapped. In addition to displaying symptoms of the handicapping condition of autism, he is most likely mentally retarded. Since his school enrollment he has had periods of progress and periods of regression. Still he functions at a pre-academic level.

In 1970, when Tom was five years old, his father sought advice as to the educational prognosis of his son from defendant Michael Chrin, then a child psychologist with the Kent City School District. Mr. Chrin attempted unsuccessfully to administer several standardized psychological tests of Tom. He then recommended to Mr. Rettig that he consider some additional evaluations in the future.

In 1971, when Tom reached compulsory school age, the plaintiff Eva Rettig brought her son Tom to defendant Kent City School District's public school to enroll him. Dr. Geraldine Irvin, the school psychologist, again attempted to evaluate Tom to determine proper placement. This evaluation took approximately an hour and fifteen minutes to an hour and a half and included the administration of a standardized intelligence test, parental interview, behavior observations, matching and drawing tests, and visual discrimination instruments. At its conclusion, Dr. Irvin advised Mrs. Rettig that, in her opinion, the Kent City School District did not have any program available for Tom. Dr. Irvin informed Mrs. Rettig that it would be her recommendation that Tom be placed in Happy Day School, a state-supported school for the trainable mentally retarded. Dr. Irvin then consulted with Michael Chrin on her evaluation of Thomas Rettig. He agreed with her recommendation. This opinion was based, in part, on his own observations of Tom the previous year. Dr. Irvin then completed the required E-1 form to apply to the State Department of Education for its approval to exclude Tom from the Kent City School District in order to permit his enrollment in Happy Day.

Mr. and Mrs. Rettig, who apparently were familiar with the program at Happy Day, refused to consider the possibility of enrolling their son there and chose instead to place him in private nursery schools. When Dr. Irvin and Mr. Chrin became aware that the Rettigs had chosen a private school option, they did not file the E-1 application for exclusion.

In 1972, after a series of tests at Cuyahoga Community College, it was recommended that Tom be enrolled at Our Lady of the Elms School in Akron. Tom re-

mained at Our Lady of the Elms until April 1974, when he entered the Severely and Multiply Impaired (SMI) unit of the Kent City School District.

These SMI classes had just been instituted the previous fall. They were housed at the University School, a private school for grades one through twelve, operated by Kent State University. The Rettigs first approached Michael Chrin in January 1974 about enrolling Tom in the SMI class, but were asked to wait until the spring when an additional aide would be available in the class.

During the summer of 1974, the Rettigs took Tom to the Judevine Center for Autistic Children in St. Louis, Missouri. The Judevine Center is a private institution whose primary purpose is to provide autistic children with the basic attention and motivation skills they need in order for them to function in public school classes. The Center also offers training sessions to both parents and teachers of autistic children.

At the Judevine Center, the Rettigs received three weeks of training in the Judevine method of intervention with autistic children. The Judevine method, as described by Rebecca Blackwell (one of plaintiffs' expert witnesses) stresses an intense one-on-one relationship between teacher and child, small classrooms, minimal distractions, and the use of negative reinforcements such as the "time-out box" and food denial.

The Rettigs were impressed with the program at the Judevine Center and the apparent progress Tom had made as a result. They conveyed their enthusiasm over the program to Dr. Robert Stanton, Superintendent of the Kent Schools. Consequently, the Kent City School District arranged for Tom's teacher Ms. Margaret Bell to attend the training program at the Judevine Center. Ms. Bell attended the three-week session in September of 1974. When she returned, she incorporated many of the Judevine techniques in her SMI class for the 1974–75 school year, which Thomas Rettig attended.

During the spring of 1975, Thomas Rettig was hospitalized in Henrotin Hospital in Chicago under the care of Dr. Theron Randolph. During this hospitalization, Dr. Randolph determined that some of Tom's behavioral problems could be attributed to allergic reactions to certain food stuffs, among them, wheat, corn, chocolate, beef, and sugar. He prescribed a strict dietary regimen which required Mrs. Rettig to maintain a rotating menu of foods for Tom so that no item was repeated within a four-day period. Mrs. Rettig spent the summer of 1975 conducting her own allergy tests with Tom to determine his reaction to other foods.

Although the Rettigs had initially been very pleased with Kent's SMI program, during the 1975–76 school year conflicts began to arise between the Rettigs and Ms. Bell over her program of instruction.

The new dietary needs of Tom caused one problem between Ms. Bell and Mrs. Rettig over a class activity that permitted the children to prepare and eat lunch once a week at Ms. Bell's home. Although Tom could participate in setting the table, preparing the food, etc., he often could not eat any of the foods offered. His own meal was prepared at home by Mrs. Rettig, and she delivered it to him at school each day at lunch time. Because denial of food had been used as a negative reinforcement for Tom, Mrs. Rettig worried that Tom would assume he was being punished when he was not permitted to eat the meal he had helped prepare.

Mrs. Rettig also objected to the number of field trips Ms. Bell had planned for the class. In Mrs. Rettig's opinion this was a waste of regular school time. She also insisted that Tom was allergic to bus fumes and therefore could not travel with the class.

These conflicts eventually culminated in a confrontation between Mrs. Rettig and Ms. Bell, and the Rettigs subsequently withdrew Tom from the class in the spring of 1976.

Thomas Rettig was re-enrolled for the 1976–77 school year, but he was transferred to the SMI class of Ms. Linda Leavitt.

Mrs. Rettig soon expressed concern over Ms. Leavitt's teaching methods. Mrs. Rettig complained that Ms. Leavitt also wasted too much time in field trips. In addition, she did not properly employ Judevine techniques; she mis-used the time-out box; on one occasion, for example, an aide apparently went away and left Tom in the box. At another point during the year, Ms. Leavitt experimented with another form of negative reinforcement. Whenever Tom refused to cooperate in his lessons, Ms. Leavitt would walk away and work with another child, explaining to Tom that when he was ready to work he should tell her so. However, Ms. Leavitt was unable to determine whether or not this would have been an effective teaching technique with Tom since it was discontinued after a week and a half at Mrs. Rettig's request.

During the summer of 1977, Thomas Rettig attended a summer school program provided by the Kent State University Department of Special Education. Much of the general program dealt with foods and nutrition so Tom's participation was limited. However, Mrs. Rettig volunteered to work with Tom's teacher for the summer, Ms. Susan Taylor.

Ms. Taylor worked well with Mrs. Rettig and Tom, so well, that Mrs. Rettig submitted a letter of recommendation on behalf of Ms. Taylor to the Kent City School District. Ms. Taylor was hired for the following fall and was Tom's teacher during 1977–78.

During the summer of 1978, Tom was enrolled in a program sponsored by the University. He also attended a camp for handicapped children.

In September 1978, the special education classes housed at the University School were moved to public school buildings. Tom's class was moved to Longcoy School, an elementary school located two blocks from the Rettig's home. Tom's class was moved to Longcoy, as opposed to some other school in the district, because of its proximity to Tom's residence. Mrs. Rettig had complained about the inconvenience of having to bring Tom's lunch to school every day. At Longcoy, Tom could walk to and from school; he could walk home for lunch.

Because the SMI classes were located in a regular public school during the 1978–79 school year, Tom was now afforded some opportunity for structured interaction with non-handicapped students. He attended music, art, and physical education classes with non-handicapped students. He also attended the first half hour of a normal fourth grade class, accompanied by an aide. He shared lunch and recess periods with non-handicapped students.

During the summer of 1979, Dr. William Bricker of Kent State's Special Education Department offered a program specifically designed for Tom, but the Rettigs refused to enroll him.[1]

## CONCLUSIONS OF LAW

I. *Allegation of unconstitutional denial of educational opportunity—1971–74:*

█ The plaintiffs claim that Thomas Rettig was denied admission to the school district of his residence, and that the alleged denial of admission violated the plaintiffs' constitutional rights to due process and equal protection.

In 1971 when Tom first attempted to enroll in public school, there was no comprehensive statutory scheme mandating the education of handicapped children. What was in existence in 1971 was a statutory scheme whereby local school districts could lawfully exclude children whose handicaps prevented them from participating in regular school programs.

In 1971, Sections 3321.05 and 5127.01 of the Ohio Revised Code were applicable. Section 3321.05 provided in part:

A child of compulsory school age may be determined to be incapable of profiting by further instruction . . .

---

1. The summer programs at Kent State provided in 1977, 1978, and 1979 offered three hours of instruction per day for five weeks or more at no cost to the parents.

... the capacity of a child to benefit substantially by further instruction shall be determined with reference to that available to the particular child in the public schools of the district in which he resides ...

Section 5127.01 provided in pertinent part:

The chief of the division of mental retardation and developmental disabilities, with the approval of the director of mental health and retardation, shall establish in any county or district a training center or workshop, residential center, and other programs and services for the special training of mentally retarded persons, including those who have been adjudged by the proper authorities to be eligible for enrollment in public schools under section 3321.01 or 3321.05 of the Revised Code and who are determined by the division of mental retardation and developmental disabilities to be capable of profitting by specialized training ...

In *Cuyahoga County Association for Children and Adults v. Essex*, 411 F.Supp. 46 (N.D.Ohio 1976), this Court (Judge Green) held that these provisions of the Ohio Revised Code which provided for the exclusion of some mentally handicapped children did not violate any constitutional guarantees. The Court did object, however, to some aspects of the process by which the State of Ohio excluded these children:

... Absent a requirement of notice of the grounds upon which dismissal is being sought, a right to review the material to be submitted in support of such application and response thereto or supplement the same and some assurance that all pertinent information will be placed before the decision makers, the required conference is a hollow formality ... Due process requires that a child whose educational opportunity is to be affected be afforded equal opportunity with school authorities to make a presentation regarding classification or dismissal. *Ibid* at 58–59.

Plaintiffs complain that none of these procedural safeguards were afforded them.[2] However, the evidence in this case leads to the inescapable conclusion that the Kent City School District never actually excluded Tom. Dr. Irvin, the school psychologist, made an initial determination that Tom could not substantially profit from any program of instruction available in the Kent public schools. She discussed her conclusion with Mrs. Rettig. Dr. Irvin went so far as to fill out the exclusion application which, under ORC § 3321.05, must be filed with the State for its determination, but this application, known as the "E–1 form", was never filed. The Rettigs chose instead to enroll Tom in private schools. This Court cannot speculate as to what procedures might have been followed had the exclusion process actually been pursued by the School District, nor can it speculate as to what standards for exclusion might have been applied. Since the plaintiffs elected to obtain educational placement in a private school, there cannot now be a valid claim that the Kent City School District refused to provide an educational opportunity from 1971–1974 as alleged in the Amended Complaint.

II. *Allegation of failure to provide an "appropriate" education:*

Plaintiffs have charged defendants with violations of the EHA and Section 504 of the Rehabilitation Act of 1973. Although these form separate bases of jurisdiction, the discussion in this opinion will focus upon the provisions of the EHA. As the regulations promulgated under Section 504 indicate, a school system will provide the free and appropriate education and procedural safeguards required under Section 504 by complying with the EHA. 34 C.F.R. §§ 104.33(b)(2) and 104.36.

The Education for All Handicapped Children Act mandates a "free and appropriate education" to all handicapped chil-

2. They also contend that Thomas Rettig did not fall within the definition of a child "... incapable of profitting by further instruction ..."

dren of school age.[3] Unfortunately, Congress did not supply much in the way of substantive content to the concept of an "appropriate" education. Instead, Congress emphasized the uniqueness of each handicapped child's educational requirements and defined appropriate education as "special education and related services ... provided in conformity with the individualized education program". 20 U.S.C. § 1401(18). The individualized education program (IEP) is developed by the parents and educators working together and states with some degree of precision the child's present level of performance, the objectives of his program and the services that will achieve them, and objective criteria for determining success. Id. § 1401(19). To ensure that the IEP accurately reflects the needs of the child, the Act requires a multifactored evaluation so that no single procedure, such as a standardized IQ test, is relied on exclusively in determining the child's abilities.

For purposes of determining placement, the Act sets out a second criterion in addition to appropriateness: "[T]o the maximum extent appropriate, handicapped children ... are [to be] educated with children who are not handicapped." 20 U.S.C. § 1412(5)(B). Thus it is clear that a major emphasis of the EHA is to "mainstream" handicapped children.

In discussing the goals of the EHA, the Senate Report states: "With proper education services, many [handicapped children] would be able to become productive citizens, contributing to society instead of being forced to remain burdens. Others, through such services, would increase their independence, thus reducing their dependence on society". S.Rep.No.94–168, 94th Cong., 1st Sess., reprinted in 1975 U.S.Code Cong. & Ad.News 1425, 1433.

■ Therefore, this Court concludes that an "appropriate" education for a child as severely handicapped as Thomas Rettig is one that gives him a reasonable chance to acquire the skills he needs to function outside of an institution. This does not mean

that the child deserves a perfect education. Indeed, it is unlikely that any child, handicapped or otherwise, ever receives a perfect education. It does not mean that a school system has to provide any and all services that might be beneficial. It does not mean that the school must experiment with every new teaching technique that may be suggested.

Despite the contention of the plaintiffs that money is no object under EHA, the courts, in general, have not adopted that approach. See Battle v. Commonwealth of Pennsylvania, 629 F.2d 269 (3d Cir. 1980); Rowley v. Board of Education, 483 F.Supp. 528 (S.D.N.Y.1980), aff'd, 632 F.2d 945 (2d Cir. 1980); Pinkerton v. Moye, 509 F.Supp. 107 (W.D.Vir.1981); and, by analogy, Pennhurst v. Halderman, 451 U.S. 1, 101 S.Ct. 1531, 67 L.Ed.2d 694 (1981). It hardly needs to be stated that educational funding is not unlimited, and a school cannot spend an exorbitant amount on one child at the expense of all its other handicapped children. But the school system does have an obligation to keep abreast of changing educational strategies and implement them where success may be demonstrated.

■ None of these fine goals lend much guidance to this Court in reviewing the educational requirements of Thomas Rettig. Because of his complicated handicapping conditions of autism and retardation, and because no multi-factored evaluation of Tom exists, it is almost impossible to accurately determine what his potential is, even if that were a proper role for this Court. The plaintiffs' own experts have presented conflicting opinions as to what they believe an appropriate education for Tom entails.

Rebecca Blackwell of the Judevine Center and Dr. William Bricker of Kent State University both counsel a classroom model. The classroom model revolves around the view that the autistic child has very little motivation to learn and is easily distracted. It stresses small classrooms, one-on-one teaching, and use of negative reinforcements.

3. EHA was passed by Congress in 1975 and its statutory provisions became effective as of the

1976–77 school year. Regulations under the Act were not promulgated until 1977.

Dr. Louis Brown, Dr. Ann Donnellan and Ms. Alison Ford of the University of Wisconsin represent the view that the autistic child does not generalize, *i.e.*, that what he learns in the classroom he does not know how to apply in the practical environment. This functionalist model stresses moving out of the classroom.

The Kent City School District began with the classroom model. The District even sent Tom's teacher Ms. Bell to the Judevine Center for training. To the extent that Tom's teachers have attempted to take him out of the classroom, they have been frustrated by the Rettigs' insistence first, that field trips are a waste of time and second, that Tom cannot ride a bus, swim in a pool, or have a meal away from school because of his allergies.

In fact, it appears to the Court that many of the efforts of Tom's teachers and the School District have been frustrated by the constant intrusions of Mrs. Rettig. The Court appreciates the concern these parents have for their son. It borders on heartbreak to see parents so necessarily involved in the education of a child. But if the Kent City School District is confused as to just exactly what the Rettigs expect in the way of an education for Tom, then the Court can appreciate its position also.

For example, the Rettigs' expert witness Dr. Louis Brown testified that Tom's education ought to be provided with age-appropriate peers, *i.e.*, other sixteen-year-olds. The Rettigs now ask this Court to order the School District to move Tom's class to the high school. Yet Tom's class was originally placed at Longcoy School at the parents' request so that he could walk to school. He could not walk to the high school.

Dr. Brown recommends that Tom be taught skills in the environment in which it is most appropriate for them to be performed, like parks, restaurants and other public buildings. Yet Tom's parents have consistently in the past objected to any trips outside the school.

Dr. Brown, Dr. Ann Donnellon, and Alison Ford all stressed that Tom receive instruction in functional skills such as crossing the street, using public transportation, using elevators. Yet Tom's teacher spent a considerable amount of time teaching Tom to write his name cursively at the parents' request.

The record does not support plaintiffs' picture of an obstinate and uncaring school system, but rather one that has tried very hard to accommodate the Rettigs and provide a good education for their son, but finds it difficult at times to do both.

Many of the plaintiffs' experts base their opinion that the education provided to Tom by the Kent City School District was inappropriate on the fact that Tom has made little progress. Yet it is also clear from their testimony that children such as Tom are extremely hard to reach. No one can guarantee results with these children. Dr. Donnellon testified that autistic children, like Tom, are rote ritualistic—yet their mental retardation makes it necessary to repeat a thing in order for them to retain it. Thus, teachers are often caught in the bind of contributing to the very problem they seek to correct.

This Court is unable to declare that the school system has failed Tom. The progress reports and the testimony of Tom's parents and teachers indicate that he has gained some social skills and some self-help skills, but he fails at academic tasks. In terms of Tom's own needs, it is apparent to this Court that academics ought to be secondary because if Tom is going to escape institutionalization, he needs to master some very basic self-help skills.

### A. Summer School:

Most of the experts, including defendant KSCD's expert Christopher Matey, Low-Incidence Coordinator for the Greenhills-Forest Park Board of Education, agree that some type of summer program would be beneficial to Thomas Rettig. However, the issue is not whether it might be beneficial but whether a summer school program is a necessary component of an appropriate education for Tom. In the opinion of this Court, it would be appropriate if it would prevent significant regression of skills or

knowledge retained by Tom so as to seriously affect his progress toward self-sufficiency.

The record indicates that Thomas Rettig was offered and did attend summer school during the summer of 1978. For that summer session, Tom's teacher Sue Taylor reviewed his 1977–78 IEP with his summer school teacher so that her instruction would be consistent with his regular school program. Nevertheless Ms. Taylor testified that despite the 1978 summer experience, Tom exhibited signs of regression at the beginning of the 1978–79 school year. Mrs. Rettig herself testified that Tom's periods of regression do not necessarily occur during the summer but are a year-round phenomenon. None of the experts who testified had any actual knowledge of Tom's regressive tendencies.

On the basis of this record, the Court is unwilling to order a summer school program for Thomas Rettig. However, if on the basis of a multi-factored evaluation, a new IEP for Tom called for summer school, the Court would expect the Kent City School District to offer that program and would expect the State of Ohio to provide funding.[4]

*B. In-Service Training:*

■ In-service training is a mandatory component in the overall administration of appropriate programs of special education and related services. 20 U.S.C. § 1413(a)(3) provides that:

... (A) the development and implementation of a comprehensive system of personnel development which shall include the inservice training of general and special educational, instructional and support personnel, detailed procedures to assure that all personnel necessary to carry out the purposes of this chapter are appropriately and adequately prepared and trained and effective procedures for acquiring and disseminating to teachers and administrators of programs for handicapped children significant information

derived from educational research, demonstration, and similar projects ...

The legislative history regarding the issue of in-service training demonstrates that Congress' major concern when it adopted this requirement was that most school systems and teachers had little or no experience with handicapped children:

... If the integration of handicapped children into the classroom is to be accomplished, several important changes must take place ... A teacher, who will be responsible for the management of the handicapped children in [the] classroom ...

The Committee is aware that there is a shortage of fully qualified personnel trained to serve all handicapped in educational programs. Therefore, the Committee has determined that a program's continuous in-service training be undertaken to provide general and support personnel with basic requirements needed to serve handicapped children in the classroom.

1975 U.S.Code Cong. & Ad.News, 1457.

■ However, the Kent City School District had had its SMI programs in operation for two years already. According to the testimony of Dr. Donnellon, this was years before public schools anywhere else in the country were offering programs for autistic children.

There is testimony in the administrative record, as well as supplemental evidence elicited at trial, concerning workshops, conferences, and other activities which employees of the school system attended, all with the encouragement and the funding of the school system. Internal staff meetings at which the teachers can discuss problems and exchange ideas are almost a daily occurrence among the members of the special education department of the Kent schools. When the SMI classes were moved from University School to public school buildings, meetings were conducted by Dr. Chrin with the entire staff in those buildings to explain

---

4. See this Court's Memorandum and Order dated September 15, 1980, on the class action issue.

the special needs of the handicapped students. Mr. Chrin works closely with his teaching staff and is always available to make suggestions or help work out a new teaching strategy. Although Mr. Chrin is not an expert in autism, as director of the program at Kent since its inception in 1974, he has had considerable experience in working with these children. He does observe his teachers often and does provide them with feedback on their performance.

Plaintiffs contend that none of these in-service activities included immediate implementation under supervised conditions, nor were any of the teachers ever tested on their new knowledge. However, it does not appear to this Court that it is necessary to treat these teachers like recalcitrant children. All of the teachers who testified appeared to be responsible dedicated professionals. They showed tremendous concern over the education of Thomas Rettig. They do need some supervision and they do need access to new information and new techniques. This Court is satisfied that the Kent City School District's in-service program meets these requirements.

Secondly, plaintiffs ask the Court to include "parents" within the meaning of "support personnel" and order the School District to provide in-service training for Mr. and Mrs. Rettig. On its face, the statute is not clear as to what persons were included in "support personnel". However, the legislative history suggests that the term refers to other professional staff employed by a school system:

... The supportive service should be provided by trained occupational therapists, speech therapists, psychologists, social workers and other appropriately trained personnel.

1975 U.S.Code Cong. & Adm.News 1457. This Court does not find that it includes parents.

*C. Extracurricular Activities and Related Services:*

■ Although the Act itself does not specifically address extracurricular activities and related services, regulations promulgated under its auspices do. 45 C.F.R. § 121a.306 provides as follows:

(a) Each public agency shall take steps to provide non academic and extracurricular services and activities in such a manner as is necessary to afford handicapped children an equal opportunity for participation in those services and activities.

Extracurricular activities are offered to non-handicapped students to provide them with experiences outside the realm of their normal classroom activities. It appears to the Court that plaintiffs' latest set of experts (Dr. Brown, Dr. Donnellon, and Alison Ford), in emphasizing moving Tom out of the classroom, have essentially defined his whole education in terms of extracurricular activities. It then becomes difficult to justify additional time spent with Tom repeating the same kinds of experiences he gets during his normal school day. It would not be the same kind of enrichment that non-handicapped students derive from extracurricular activities. Of course, Tommy would benefit from the extra hour or two per week just as he might benefit from the constant instruction available at a residential school.

However, the education that Tom received between 1976 and 1979 was primarily a classroom experience. In conjunction with the classroom experience, the Kent City School District did not provide any after school activities in which a child like Thomas Rettig might participate, although the School District did provide such activities for its non-handicapped students. It therefore failed to provide after school activities on an equal basis, and has been in violation of 45 C.F.R. § 121a.306.

*D. Occupational Therapy:*

This issue of occupational therapy for Thomas Rettig first arose in discussions over the 1976–77 IEP. Specifically, this involves a technique known as sensory integrative therapy, developed by a Dr. A. G. Ayers in California. At that time, the Kent City School District did not employ an occupational therapist; however, Mr. Chrin did obtain consultation services. During the 1977–78 school year, Ms. Cathy Pierce, an

occupational therapist with the Mid-Eastern Ohio Special Education Regional Resource Center (MEO–SERRC), provided occupational therapy services on a weekly basis. Tom was not provided these services because the Rettigs refused to grant permission to have Tom evaluated. However, Philippa Campbell, an occupational therapist at Children's Hospital in Akron, Ohio who had evaluated Tom at the Rettigs' request, did instruct Ms. Taylor, Tom's teacher, in therapy techniques to use with Tom. According to Ms. Campbell's testimony, occupational therapy can be administered effectively by a lay person with adequate instruction.

In December of 1978, the Kent City School District hired Lorraine Lowe, an experienced qualified occupational therapist. Ms. Lowe evaluated Thomas Rettig, recommended that he receive sensory integrative therapy and testified at the administrative hearing that as soon as she completed her evaluations of the special education children, she would begin therapy sessions with Tom.

■ Plaintiffs argue that this issue is not yet moot, however, since it goes to the issue of appropriate relief, specifically compensatory education and also to the issue of summer school. Plaintiffs contend that occupational therapy, like medical treatment, should be administered continuously until the child is cured. This does not permit a three-month hiatus in services over the summer. Plaintiffs' expert Philippa Campbell testified that "[t]he standard model for occupational therapy as well as other therapies is that therapy is provided until such point as a child no longer requires it and that it is provided continuously." P. Campbell, Tr. 154 [February 21, 1979]. Ms. Lowe testified that in her private practice in New York, she and her partner, an Ayers' faculty member, did not treat children during the summer. Neither witness testified as to how long Thomas Rettig might require therapy. Based on this evidence, the Court finds that an educational program for Thomas Rettig which does not include occupational therapy on a continuous basis is not necessarily "inappropriate".

### E. A Multi-factored Evaluation:

■ Plaintiffs' allegation with respect to this issue has three components: first, that the Kent City School District has failed to provide a publicly-financed medical evaluation of Tom; second, that the Kent City School District has conducted evaluations without obtaining parental permission; and third, that the information made available to parents when permission is sought is inadequate.

The administrative record is clear that the Kent City School District did not provide, either before or after Thomas Rettig's initial placement, a publicly paid for, in-depth medical evaluation. Plaintiffs contend that had such a medical evaluation been completed in 1974 prior to Tom's placement in SMI class, as required, his allergic reaction to certain foodstuffs would have been discovered a year earlier. They further contend that since Tom's allergies interfere with his ability to learn, the practical effect of the defendants' failure was to deny Tom the benefit of a year of schooling. However, the applicable standard in 1974 merely stated that "[a]ll children being considered shall be examined by a licensed physician for initial placement ..." *Comprehensive Plan for the Education of the Handicapped,* adopted July 1, 1973, p. 23. Since the Rettigs had to take their son to Chicago in order to obtain the allergy treatment outlined by Dr. Theron Randolph, it may be assumed that this treatment was not available locally. In fact, upon examination of Dr. Randolph's methods it taxes the credulity of this Court to believe that a standard medical examination by a local physician would have uncovered Tom's condition.

State regulations provide:

1. The parents shall be notified of intent to identify and evaluate their child suspected of needing a special education program or related service and shall be provided an opportunity to submit any data relevant to the subsequent evaluation of their child.

2. Written parental permission shall be obtained before evaluation is initiated.

3301–51–18 (B). *Standards for Special Education.*

The administrative record indicates at least two instances in which standardized testing of all the children in the SMI classes, including Tom, were undertaken by the Kent school system without notifying or requesting permission of the Rettigs, one in June of 1977, the other in May or June of 1978. It was the testimony of Mr. Chrin that these particular procedures were not administered for the purpose of determining an appropriate educational placement for any particular child but rather that these group assessments were a necessary component of the District's application for federal monies to help fund the program. The State standards define an "evaluation" for which parental consent is required as:

> ... those activities involved in gathering data about a *specific* child, including such methods of testing and interviewing, *for the purposes of determining an appropriate educational placement for the child* ... [Emphasis added.]

3301–51–16 (A)(4)(m), *Standards for Special Education.*

These assessments of a group of children for the purpose of compliance with funding legislation did not involve placement decisions for any specific child, including Tom. Additionally, Ms. Taylor, Tom's teacher 1977–79, testified that she did not utilize the group assessments in the development of any IEP for him. For these reasons, the Court finds no legal necessity to obtain permission of the Rettigs prior to conducting these assessments.

▮ When parental permission is sought by the Kent City School District, it must comply with the State regulations contained in 3301–15–18(B)(5). 3301–15–18(B)(5) lists ten items of information that must be provided to the parents prior to any evaluation of their child. The Rettigs have consistently refused to permit any evaluation of their son since 1976, alleging that the School District has failed to supply the requisite information.[5] In reviewing the application for permission to do an evaluation submitted to the Rettigs on September 13, 1978, the Court finds the application, for the most part, to be in compliance. It fails, however, as required by 3301–15–18(B)(5)(f) to give a "[g]eneral description of procedures and instruments that *will be used*," [Emphasis added.] Instead it provides a list of possible procedures and instruments, and to that extent, it is inadequate.

On the basis of the record in this case, there is considerable question as to whether the Rettigs would have permitted any evaluation of their son that included standardized tests. It is clear from her testimony at the administrative hearing that Mrs. Rettig firmly believes that no norm-referenced instrument is descriptive at all of her son's ability.

To some extent, it is true that autistic children are not testable. One of the primary characteristics of their handicap is that they do not seem to care to interact with other human beings. This lack of social behavior extends to parents, teachers, peers, etc., and to anyone attempting to administer a standardized test. They do not cooperate with the tester and thus, they may score much lower than their actual mental potential.

It is Mrs. Rettig's nightmare that the Kent City School District will use the results of standardized tests as the basis upon which to "force the parents to agree to place Tommy into a 169 program for retarded children", (such as Happy Day School.) See letter dated 11–22–79 from Mrs. Rettig

5. In 1976 prior to the adoption of the above-referenced regulations, Dr. Robert Robinson of MEO–SERCC did administer a psychological evaluation of Thomas Rettig for the Kent City School District. According to Dr. Robinson's report, this consisted of five different assessment instruments and observational data. During the administration of these tests, Tom's teacher was present in order to properly motivate Tom and properly interpret his responses. Inasmuch as "no single procedure was the sole criterion" for Dr. Robinson's final recommendation, this evaluation was "multi-factored".

to the Members of the State Board of Education.

However, it is clear to the Court from the expert testimony in this case that despite the problems associated with standardized tests, they can be used to gain certain information and insight into the capabilities of an autistic child and, in addition, provide an objective criterion for comparison in the future. The fact that norm-referenced procedures are used, in and of itself, does not render a multi-factored evaluation valueless.

III. *Allegation of failure to monitor compliance:*

 Plaintiffs produced only one witness on this issue, Dr. Samuel Bonham, Director of the Division of Special Education for the Ohio Department of Education. He testified that not only was Ohio the first state in the country to develop a comprehensive scheme for monitoring special education programs, but that Ohio's monitoring program is considered a model by other systems throughout the country. Based on that record, this Court cannot make a finding that the State has failed to monitor local school districts for compliance with EHA.

Plaintiffs contend that the very fact that the State Board of Education approved the decision of the Impartial Hearing Officer in this case demonstrates a failure to monitor. The Court finds this argument unpersuasive. Further, plaintiffs contend that the policy of the Ohio Department of Education to take no action against a school system once an impartial hearing has been requested is violative of the federal provision requiring states to monitor. See 20 U.S.C. § 1412(6).

Adoption of this view would require the State to impose sanctions before there has been a final determination as to whether a school system has, in fact, failed to comply with some aspect of the EHA. In light of the fact that the State's only sanction is to

withdraw funds from the school district involved, and the obvious penalty that this would inflict on all of the district's handicapped children, the Court finds the State's policy to be eminently reasonable.

IV. *Allegation of violation of EHA by state standards regarding issuance of decisions on appeal:*

 The federal regulations pertaining to the procedural safeguards available under the EHA provide as follows:

(a) The public agency shall insure that no later than 45 days after the receipt of a request for a hearing:

(1) A final decision is reached in the hearing; and

(2) A copy of the decision is mailed to each of the parties.

(b) The State educational agency shall insure that not later than 30 days after the receipt of a request for a review:

(1) A final decision is reached in the review; and

(2) A copy of the decision is mailed to each of the parties.

45 C.F.R. § 121a.512

Neither of these provisions has been followed in this case. Subsection (a) was apparently abrogated by the parties themselves, who agreed to an interrupted trial schedule that eventually lingered on for four months, January to April, 1979. Subsection (b) was completely ignored by the State which failed to render a decision even within the 60 days permitted under State standards.[6] The Court can certainly appreciate the State's claim that this was an extremely complicated case, but 193 days far exceed the realm of reasonable delay.

Because of these delays, by the time this case reached the level of federal court review, the record was already very cold. A new IEP for Thomas Rettig was already being formulated. That IEP is not properly before this Court, since EHA requires ex-

---

**6.** Even if the Court takes into consideration the fact that Mrs. Rettig did not submit her brief until July 20, 1979, the State did not render its

decision within 30, or even 60, days from that date.

haustion of administrative remedies.[7] Hence, this Court has found itself in the very uncomfortable position of reviewing an educational program that is no longer applicable. Such a review can hardly be deemed meaningful, at least not from Tommy Rettig's point of view.

The State defendant is ordered to immediately revise its standard, 3301–5–16(D)(5)(b) [which allows the State Board of Education 60 days to render its decisions reviewing impartial hearings] so as to comply with the federal regulation.

### RELIEF

1. The defendant School District has previously petitioned this Court for permission to administer a multi-factored evaluation of Thomas Rettig. In the interests of defusing the conflict between the School District and the Rettigs, and ensuring that Thomas Rettig's education continues to be appropriate for his needs, the Court orders the School District to conduct a multi-factored evaluation in strict compliance with 45 C.F.R. Section 121a.532. That evaluation will be incorporated in the new IEP to be formulated for the 1981–82 school year. The Rettigs and an expert of their choice may participate in the development of that IEP.

2. The Kent City School District is further ordered to provide at least one hour per week of extracurricular activities for Thomas Rettig in accordance with the new IEP.

3. The State defendant, as indicated in a prior section of this opinion, is ordered to revise the time allowance in 3301–5–16(D)(5)(b) and to adopt a 30-day standard.

4. As for plaintiffs request that the defendant School District be ordered to continue to provide Thomas Rettig with a free and appropriate education for seven additional years from age 22 to 29, this Court would order compensatory education in an appropriate case. See, for example, *Campbell v. Grissett*, C.A. No. 79–M–277, (N.D. Ala. March 31, 1981); however, the fact pattern here is easily distinguishable.

7. See this Court's Order dated April 24, 1981.

5. In light of the fact that each of the parties has prevailed on some of the merits, this Court is not inclined to award counsel fees. Each party is to bear its own costs.

IT IS SO ORDERED.