917 F.2d 1460
 63 Ed. Law Rep. 798
 Chance CORDREY, a minor; Karen Cordrey and Robert Cordrey,
on behalf of their minor son, Plaintiffs-Appellants,
v.
R.J. EUCKERT, Supt.; Gregg Simon, Board Member; Mariann
Gleckler, Board Member; Loren Pennington, Board Member;
Evergreen Local School District; Evergreen Board of
Education, Defendants-Appellees.
 No. 89-3035.
 United States Court of Appeals,
Sixth Circuit.
 Argued Oct. 5, 1989.
Decided Nov. 5, 1990.
 
 Susan G. Tobin (argued), Michael Kirkman, Ohio Legal Rights Service, Columbus, Ohio, for plaintiff-appellant.
 Theodore M. Rowen, Lisa E. Pizza, B. Gary McBride (argued), Spengler, Nathanson, Heyman, McCarthy & Durfee, Toledo, Ohio, for defendants-appellees.
 Thomas J. Zraik, Office of Advocates for Basic Legal Equality, Inc., Toledo, Ohio, for amicus curiae.
 Before BOGGS and NORRIS, Circuit Judges, and ENGEL, Senior Circuit Judge.
 ENGEL, Senior Circuit Judge.
 
 
 1
 Plaintiff Chance Cordrey, a minor, is a handicapped child within the meaning of The Education For All Handicapped Children Act ("the Act"), 20 U.S.C.A. Sec. 1400 et seq. (1989). With his parents he appeals a judgment entered in the district court in favor of the defendants, the Evergreen Local School District, the Evergreen School Board and several School Board officials (collectively, "Evergreen"). The Cordreys claimed that by failing to provide Chance with an extended school year (ESY) program,[1] Evergreen has denied him a "free appropriate public education" in violation of the Act. The appeal presents several issues, including whether and under what circumstances parents may be deemed to have waived a procedural right under the Act, and the proper standard by which a court should review a denial of an ESY to a handicapped child. We ultimately hold that the parents here did waive certain procedural rights under the Act, and that the district court did not err as a matter of law or fact in ruling that Evergreen was not obligated to provide Chance with an ESY.
 
 I.
 
 2
 Chance, now fifteen years old, is handicapped by severe developmental delays following an autistic pattern. His maladaptive autistic behaviors include self-stimulation, self-abusiveness, non-attending behaviors, and social withdrawal. His communication skills consist of four manual signs, and he can work independently for only three to five minutes at best. An individualized educational program (IEP), required under the Act, was formulated for Chance for the 1981-82 school year, and he was placed in a multihandicapped class in a Toledo public school. This class did not operate during the summer. In 1982, the Cordreys enrolled Chance in a summer education program operated by the Toledo Autistic Society (TAS), a non-profit private agency. In May 1984, after two summers of the private program, the Cordreys requested Evergreen to pay for Chance's program as part of his IEP. Without convening a meeting to review Chance's IEP as provided by the Act, the Evergreen Board of Education decided that Chance should receive an ESY at a summer program run by the Fulton County Board of Mental Retardation and Developmental Disabilities.
 
 
 3
 In November 1985, an IEP meeting was held, but the Cordreys and Evergreen were unable to reach an agreement regarding summer services for Chance. Instead, in May 1986, the parties negotiated a process to address the ESY issue during the 1986-87 school year. Pursuant to the agreement, the parties selected Dr. Mark Pittner, a clinical psychologist, to evaluate Chance. Dr. Pittner completed the evaluation in April 1987. He concluded that Chance would benefit from an ESY program, and faced an "unacceptable" and "untenable" risk of regression without one. Dr. Pittner also stated, however, that it was impossible to assess empirically or psychometrically whether an ESY program was necessary for Chance since he had been enrolled in a summer program for the previous several years.
 
 
 4
 On May 5, 1987, the Cordreys met with the Superintendent of Evergreen schools, a Fulton County Board psychologist, a psychology intern and counsel for the parties. Neither Dr. Pittner nor Chance's teacher, Judy Jasco, attended. Based on Dr. Pittner's evaluation, the parties agreed that Chance should be enrolled in an ESY program in the coming summer. While Evergreen suggested that Chance should be placed in the county program, the Cordreys strongly favored the TAS program. Furthermore, Evergreen refused to place an ESY program on Chance's IEP unless the Cordreys agreed to exclude the program from the "stay put" provision of the Act, 20 U.S.C. Sec. 1415(e)(3). This section provides that a handicapped child's placement may not be changed while a hearing or suit challenging an IEP is pending. Rejecting this condition, the Cordreys countered that the IEP meeting was improperly constituted under the Act because Chance's teacher was absent. Evergreen responded that the meeting was not an IEP meeting but only a preliminary discussion of Dr. Pittner's report, and offered to hold a formal IEP meeting at a later date with Chance's teacher in attendance. The Cordreys refused the offer. The meeting then ended without agreement between the parties.
 
 
 5
 Several days later, on May 11, the Cordreys requested an impartial due process hearing pursuant to the Act to challenge the lack of an ESY in Chance's IEP. Following a hearing in December 1987, the impartial hearing officer concluded that Chance should receive ESY services, and that these could be provided through the county program. On appeal the state-level reviewing officer reversed, concluding that the Cordreys had failed to demonstrate that Chance needed an ESY. The Cordreys then began the present suit in federal district court, where they further alleged that Evergreen had discriminated against Chance on the basis of his handicap. On December 8, 1988, the district court held that Evergreen had not violated the procedural mandates of the Act and that the Cordreys had failed to prove that Chance would suffer significant regression of skills without a summer program. The court did not directly address the discrimination claim.
 
 
 6
 On appeal, the Cordreys argue that Evergreen violated the procedural requirements of the Act as well as its "stay-put" provision. They also contend that Evergreen's failure to provide an ESY to Chance denied him a "free appropriate public education" under the Act, and that the district court further erred in placing the burden of proof on this issue on the Cordreys. Last, they renew their discrimination claim.
 
 II.
 
 7
 The Act requires any state that receives funding thereunder to provide all handicapped children with a "free appropriate public education," 20 U.S.C. Sec. 1412(1), "regardless of the severity of their handicap." Sec. 1412(2)(C). A "free appropriate public education" is one which is designed to meet the unique needs of the child, by means of an "individualized education program" (IEP). Secs. 1401(a)(16), (18). The Act and corresponding federal and state regulations detail the procedures by which an IEP is to be developed and revised by the parents, the school district and the teacher. Secs. 1401(a)(19), 1415; 34 C.F.R. Sec. 300.340-349; Ohio Admin.Code. Sec. 3301-51-02. If dissatisfied with any matter relating to the child's evaluation or educational placement, the parents may seek an impartial due process hearing to resolve the matter, with appeal to the state educational agency. Secs. 1415(b)(2), 1415(c). Thereafter, "[a]ny party aggrieved by the findings and decision" of the state administrative hearing may bring a civil action in a federal district court. Sec. 1415(e)(2).
 
 
 8
 In Hendrick Hudson Bd. of Education v. Rowley, 458 U.S. 176, 102 S.Ct. 3034, 73 L.Ed.2d 690 (1982), the Supreme Court observed that neither the Act nor its legislative history establishes a substantive standard defining what level of education amounts to a "free appropriate public education." 458 U.S. at 189, 102 S.Ct. at 3042. The Court did conclude, however, that "adequate compliance with the procedures prescribed would in most cases assure much if not all of what Congress wished in the way of substantive content of an IEP." 458 U.S. at 206, 102 S.Ct. at 3050. "[A] court's inquiry in suits brought under Sec. 1415(e)(2) is twofold. First, has the state complied with the procedures set forth in the Act? And second, is the individualized educational program developed through the Act's procedures reasonably calculated to enable the child to receive educational benefits?" 458 U.S. at 206, 102 S.Ct. at 3051. Rowley thus "requir[es] adherence to the procedural demands of the Act, while giving utmost deference to specific educational decisions once it is determined that they stem from the procedures outlined in the Act." Doe v. Defendant I, 898 F.2d 1186, 1188-89 (6th Cir.1990).
 
 III.
 
 9
 We now consider various procedural issues under the first prong of the Rowley inquiry.A. Whether the Cordreys waived their right to a properly constituted IEP meeting
 
 1. Standard of review
 
 10
 The Cordreys do not contest any of the trial court's factual findings relating to this issue. Although neither party discussed the proper standard of review on appeal, we conclude that the issue of waiver is a question of law or at least of mixed law and fact, subject to de novo review. See Taylor & Gaskin, Inc. v. Chris-Craft Industries, 732 F.2d 1273, 1277 (6th Cir.1984).
 
 2. Waiver
 
 11
 A waiver normally occurs by "an intentional relinquishment of a known right." See, e.g., Palfy v. Cardwell, 448 F.2d 328, 332 (6th Cir.1971). The waiver must be knowing, intelligent, and voluntary. Leaman v. Ohio Dep't. of Mental Retardation, 825 F.2d 946, 956 (6th Cir.1987) (en banc). The burden of proof is upon the party claiming the waiver. Masden v. Travelers Ins. Co., 52 F.2d 75, 76 (8th Cir.1931); see Palfy, 448 F.2d at 332.
 
 
 12
 The trial court found that the May 5, 1987 meeting was an IEP meeting. Because Chance's teacher did not attend, the meeting plainly violated the procedural requirements of the Act. 20 U.S.C. Sec. 1401(a)(19); see also 34 C.F.R. Sec. 300.344(a)(2) and O.A.C. Sec. 3301-51-02(E)(1)(a)(ii).[2] The court also found that Evergreen did not make any placement decisions at the meeting. Rather, Evergreen merely "suggested" formally placing Chance in the County ESY program as part of his IEP, on the condition that the Cordreys waive the "stay-put" provision of the Act. The district court held that the Cordreys waived their right to a properly constituted IEP meeting when, with benefit of counsel, they unreasonably rejected Evergreen's offer to schedule one. The court reasoned that they had not shown that a further meeting would have been futile because there was no evidence that Evergreen would have continued to refuse to subject an ESY to the "stay-put" provision, if they were later to produce evidence that Chance would suffer significant regression without an ESY. In support of the waiver holding, the trial court cited various cases on waiver of constitutional statutory rights, including Palfy and Leaman, supra. None of these cases arose under the Act, and there do not seem to be any prior administrative or judicial decisions which address the specific waiver here.
 
 
 13
 The Cordreys contend that their refusal of Evergreen's offer was not a waiver because a further meeting would have been pointless. They emphasize, as the parties stipulated in the informal due process hearing below, that Evergreen had agreed at the May 5 meeting that based on Dr. Pittner's opinion, Chance should be enrolled in an ESY program in the coming summer and that Evergreen had decided that the county program was proper. The Cordreys also express their frustration and sense of futility at Evergreen's failure to convene a proper IEP meeting, when they had been seeking ESY services for their son for three years and had specifically agreed with Evergreen to hold an IEP meeting to discuss Dr. Pittner's evaluation. In their view, to sanction them for walking out and seeking an ESY through the administrative and judicial review process under the Act would effectively give the school district complete control over their right to this review.
 
 
 14
 Whether the district court rightly concluded that the Cordreys waived their right to a proper IEP meeting seems to hang on the court's finding that Evergreen did not make a placement decision at the May 5 meeting but rather conditionally offered to include an ESY in Chance's IEP. This finding, supported by the undisputed fact that Chance's IEP has never included an ESY placement, is not clearly erroneous. Thus, the issue of Chance's ESY placement was still open after the meeting.[3]
 
 
 15
 As noted above, Rowley makes clear that compliance with the Act's procedures for developing an IEP is of central importance in determining its substantive propriety. A school district must heed these requirements, particularly those "giving parents and guardians a large measure of participation at every stage in the administrative process," including the formulation of an IEP. 458 U.S. at 205, 102 S.Ct. at 3050. We emphasize today that the parents likewise are obligated to operate within the Act's procedural framework. Although we have some sympathy for the frustration of Chance's parents, we are unwilling to hold that the school district's initial failure to comply with its procedural obligations, followed promptly by an offer to remedy its default, was sufficient to entitle the Cordreys to abort the IEP process. In effect, they seek to employ Evergreen's technical violation to transform the administrative review process into an alternative route to obtain an ESY for Chance. We agree that a school district should not be allowed to frustrate the parents' rights under the Act by a policy of repeated procedural violations followed by contrite offers to repent and sin no more. That, however, is not the case here. The Cordreys do not contest the trial court's finding that they acted knowingly and voluntarily in refusing the offer, especially since they were accompanied by counsel at the May 5 meeting. We thus agree with the trial court that they voluntarily relinquished their right to a procedurally correct IEP meeting in the hope that they might win an ESY for Chance through the review process. Cf. Leaman, 825 F.2d at 956 (noting that waiver was knowing, voluntary, and with benefit of counsel).
 
 
 16
 B. Other alleged procedural violations of the Act by Evergreen
 
 1. Standard of review
 
 17
 Whether a school district has complied with the procedural requirements of the Act is a question subject to review de novo. Doe v. Defendant I, 898 F.2d at 1190. Findings of fact by the district court are accepted on appeal unless clearly erroneous. See Taylor & Gaskin, 732 F.2d at 1277. We consider the remaining allegations of procedural violations employing these standards.
 
 2. Burden of proof
 
 18
 The Cordreys and amicus Advocacy, Inc., a public advocacy group for the developmentally disabled, urge that the burden of proof of procedural compliance is properly on the school district. Advocacy emphasizes that the Act affirmatively obliges the states to comply with its comprehensive procedures. See, e.g., 20 U.S.C. Sec. 1415(b)(1)(C) (requiring states to give written notice to parents regarding placement decisions); 34 C.F.R. Sec. 300.345 (requiring states to take certain steps to ensure that parents are afforded the opportunity to participate in the development of their child's IEP). The logic of such a position seems to be that the state must earn the deference which Rowley accords to it when the court reviews the substantive content of the IEP. Thus, in Doe v. Defendant I our court held that "Rowley teaches that courts must subject IEP's to a strict review when determining whether they are procedurally deficient." 898 F.2d at 1190. On the other hand, nothing in the Act indicates that alleged violations should be treated differently from alleged violations of any other federal statute imposing affirmative obligations on the states and their subsidiaries. Absent more definitive authorization or compelling justification, we decline to go beyond strict review to reverse the traditional burden of proof.
 
 3. The alleged violations
 
 19
 Without specifically addressing the issue of burden of proof, the district court held that Evergreen had not violated any other procedural provisions of the Act or of Ohio law. On appeal to this court, the Cordreys raise several alleged procedural violations by Evergreen in addition to the improperly constituted IEP meeting.
 
 
 20
 a. Did Evergreen make a placement decision inconsistent with
 
 
 21
 Chance's IEP and without input from the IEP team?
 
 
 22
 The Cordreys argue that Evergreen violated the Act and related regulations by deciding at the May 5 meeting to place Chance in the county ESY program without referring to his IEP or assessing whether the program was suitable and without input by his teacher, parents, or persons knowledgeable about the adequacy of the county program. Having already upheld the trial court's finding that Evergreen did not make a placement decision for Chance at the meeting, we find no procedural violation here.
 
 
 23
 b. Did Evergreen fail to document the parents' refusal to
 
 
 24
 attend a reconvened IEP meeting?
 
 
 25
 A school district must ensure that the parents of a handicapped child have full opportunity to participate in the IEP meeting. Should the parents refuse to attend, the district must maintain records of its attempts to arrange a mutually agreeable meeting. 34 C.F.R. Sec. 300.345(d). The corresponding Ohio regulation provides that a waiver signed by the parents may substitute for such records. O.A.C. Sec. 3301-51-02(E)(2)(b). The Cordreys allege that Evergreen offered none of the required documentation to prove its claim that they waived their right to a proper IEP meeting. As Evergreen persuasively responds, however, this omission is insubstantial since the Cordreys explicitly rejected Evergreen's offer to reconvene an IEP meeting and initiated a due process hearing only six days later. The Cordreys do not suggest that they might have been receptive to a renewed offer for a reconvened meeting; indeed, Mrs. Cordrey testified in deposition in this litigation that she thought another IEP meeting would have been futile. Evergreen's failure to document refusal was thus inconsequential. See Doe v. Defendant I, 898 F.2d at 1190-91 (declining to "exalt form over substance" by holding that technical deviations from the Act's procedural requirements render an IEP invalid); Burke Cty. Bd. of Education v. Denton, 895 F.2d 973, 982 (4th Cir.1990) (minor procedural faults of school board were insignificant since they did not cause the child to lose educational opportunity); compare with Spielberg v. Henrico County Public Schools, 853 F.2d 256, 259 (4th Cir.1988) (school district's placement decision made without reference to an IEP or parental involvement constitutes denial of a free appropriate public education to the child), cert. denied, 489 U.S. 1016, 109 S.Ct. 1131, 103 L.Ed.2d 192 (1989); Hall v. Vance Cty. Bd. of Education, 774 F.2d 629, 635 (4th Cir.1985) (school district's repeated failures to inform parents of their procedural rights constitutes denial of a free appropriate public education to the child).
 
 
 26
 c. Did Evergreen fail to conduct an IEP meeting without the Cordreys?
 
 
 27
 The Act provides that a meeting to review and possibly to revise a child's IEP must be held at least once a year. 20 U.S.C. Sec. 1414(a)(5); see 34 C.F.R. Sec. 300.343(d); O.A.C. Sec. 3301-51-02(E)(12). The relevant regulations also state that an IEP meeting "may be conducted without a parent in attendance if the [school district] is unable to convince the parents that they should attend." 34 C.F.R. Sec. 300.345(d); O.A.C. Sec. 3301-51-02(E)(3).
 
 
 28
 The Cordreys argue on appeal that regardless of whether Mr. and Mrs. Cordrey waived their right to participate, Evergreen was still obliged to consider Chance's needs at a properly convened IEP meeting following the improper May 5 meeting. They apparently allege that Evergreen failed to do so. Evergreen responds that having refused to cooperate, the Cordreys are not in a position to object that it failed to conduct a proper IEP meeting. Since under the cited regulations an annual meeting to review the child's IEP is mandatory while parental attendance is not, Evergreen's position is not, in our view, well taken. See Spielberg, 853 F.2d at 259.
 
 
 29
 If in fact Evergreen failed to conduct a proper IEP meeting for Chance in 1987, its failure to follow the procedures of the Act would seem sufficiently substantial to support a charge that Evergreen denied Chance a "free appropriate public education" under the Act. See Doe, Spielberg, and Hall, supra. However, the record clearly indicates that an IEP meeting was in fact held in November 1987, one year after the previous IEP meeting. See Jt.App. at A62-63 (Chance's IEP, dated November 1987); Jt.App. at A55 (Chance's IEP, dated November 1986). See also Jt.App. at A56-59 (teacher Jasco's review of Chance's IEP and progress, dated May 30, 1987); Appellant's Reply Brief at 9 n. 1 ("Since May 5, 1987, the Cordreys have met with Evergreen officials at least six times to discuss Chance's IEP."). We recognize that no minutes of any meetings to evidence Evergreen's specific conduct were in the record, as pointed out by the Cordreys at oral argument. It is also true that the district court did not address this issue, probably in the belief that its findings concerning waiver mooted the issue, and we have carefully considered whether this circumstance warrants a remand. However, from the undisputed evidence available it is so apparent that an annual meeting was held in substantial compliance with the state and federal regulations that the Cordreys' objections to the contrary are untenable.
 
 
 30
 d. Did Evergreen violate the "stay-put" provision of the Act?
 
 
 31
 Under the "stay-put" provision of the Act, a child shall remain in his current educational placement pending an impartial due process hearing or subsequent appeals, "unless the State or local educational agency and the parents ... otherwise agree." 20 U.S.C. Sec. 1415(e)(3); see also 34 C.F.R. Sec. 300.513 and O.A.C. Sec. 3301-51-02(b). The stay-put provision applies only to services included in the child's IEP. Gregory K. v. Longview School Dist., 811 F.2d 1307, 1314 (9th Cir.1987).
 
 
 32
 It is undisputed that Chance's IEP has never formally included an ESY placement. Accordingly, the district court concluded that Evergreen had not violated the stay-put provision by refusing to maintain Chance in the private TAS program where his parents had placed him. Since Evergreen never formally decided to include an ESY placement in Chance's IEP, see supra Sec. III-A-2, then this ruling must stand.
 
 
 33
 The Cordreys further argue that Evergreen violated the stay-put provision by refusing at the May 5, 1987 meeting to include an ESY on Chance's IEP unless his parents agreed to exempt the placement from the provision. In their view, Congress could not have intended that the school district have such unilateral control of the IEP, nor have expected that the school district would go to such lengths to avoid its alleged obligations under the Act. No legislative history or other authority is cited in support of this claim. For its part, Evergreen suggests that the "otherwise agree" clause specifically permits conditional placements.
 
 
 34
 We decline to adopt the interpretation advanced by either of the parties. The stay-put provision does not seem to be one of the Act's procedural requirements, like those discussed earlier, that attempts to ensure an adequate IEP and whose violation would constitute a denial of a free appropriate public education. Rather, the stay-put provision is activated only when a party has alleged such a violation and initiated administrative and judicial review. Analytically, we believe that Chance's objection to Evergreen's conditional offer of an ESY raises not a procedural but a substantive issue: was Chance entitled to but wrongfully denied an ESY as a part of his IEP? This issue will now be discussed.
 
 IV.
 A. Standard of review
 
 35
 The de novo standard of review established in Doe v. Defendant I applies to the substantive as well as procedural inquiries into whether an IEP constitutes a "free appropriate public education." See 898 F.2d at 1190; see also Clevenger v. Oak Ridge School Bd., 744 F.2d 514, 516 (6th Cir.1984) (stating that whether a given educational program is appropriate is a mixed question of fact and law, ordinarily freely reviewable on appeal). The Supreme Court in Rowley rejected the position that the Act gives courts broad power in the substantive inquiry to upset placement decisions by school officials:
 
 
 36
 ... [T]he provision that a reviewing court base its decision on the "preponderance of the evidence" [, 20 U.S.C. Sec. 1415(e)(2),] is by no means an invitation to the courts to substitute their own notions of sound educational policy for those of the school authorities which they review.... The fact that Sec. 1415(e) requires that the reviewing court "receive the records of the [state] administrative proceedings" carries with it the implied requirement that due weight shall be given to these proceedings.
 
 
 37
 458 U.S. at 206, 102 S.Ct. at 3050-51. Interpreting this and related passages in Rowley, our circuit has held that a district court should exercise de novo review over the school district's placement decision, but should accord it "due weight" and "greater deference ... if the procedural requirements of the Act are met. In this way, the court's encroachment on the basically legislative decisions involving the distribution of educational resources is kept to a minimum." Roncker v. Walter, 700 F.2d 1058, 1062 (6th Cir.1983).
 
 B. Burden of proof
 
 38
 This circuit has recently joined the Fifth Circuit in holding that the party challenging the terms of an IEP should bear the burden of proving that the educational placement established by the IEP is not appropriate. Doe v. Defendant I, 898 F.2d at 1191 (citing Tatro v. Texas, 703 F.2d 823, 830 (5th Cir.1983), aff'd in part, rev'd in part, on other grounds, sub nom. Irving Indep. School Dist. v. Tatro, 468 U.S. 883, 104 S.Ct. 3371, 82 L.Ed.2d 664 (1984)). Under this rule, Chance and his parents would bear the burden of proof since they seek to add ESY services to his IEP.
 
 
 39
 The Cordreys raise several objections to this conclusion, but none is persuasive. First, they contend that it is Evergreen that seeks to change Chance's placement because an ESY had been functionally if not formally a part of his IEP by virtue of the Agreement and Mutual Release signed by the parties in June 1986. The Agreement provided that an ESY program was "necessary" for Chance in 1985 and 1986, and that Evergreen would pay for part of these programs and transport Chance to them. As Evergreen points out, however, other provisions of the Agreement plainly undercut the Cordreys' argument. Paragraph 5 of the Agreement provides that Evergreen made these concessions only to avoid litigation and not to admit any legal obligation, and that Chance should be evaluated to determine if and to what degree he needed an ESY in 1987. Evergreen also explains convincingly that it agreed that an ESY in 1985 and 1986 was "necessary" only to secure funding for the agreed payments.
 
 
 40
 Second, the Cordreys argue that they do not now seek for the first time to change the IEP, but rather that they have never agreed to the lack of an ESY in the IEP. This claim is belied by the fact that the Cordreys first requested Evergreen to pay for Chance's summer programs in 1984, three years after they and Evergreen first developed Chance's IEP.
 
 
 41
 In the alternative, the Cordreys urge that Evergreen should bear the burden of proof because it failed to meet a procedural requirement of the Act in not documenting the parents' refusal to attend an IEP meeting.[4] Even though not significant enough to render the IEP invalid automatically, they argue this infraction should at least raise a presumption that the IEP is substantively invalid. While this argument would have some appeal in a proper case, it fails here, where we have found no relevant violation of the procedures which might have any bearing upon the resolution of the specific complaint.
 
 
 42
 Chance and amici also propose an alternative standard under which the school district would always bear the burden of proof. This position has since been undercut in this circuit by Doe v. Defendant I.
 
 
 43
 C. The standard for whether an ESY is necessary to a "free appropriate public education"
 
 
 44
 As we have noted earlier, see supra p. 1464, the key substantive term of "free appropriate public education" in the Act is defined in "general and somewhat imprecise" terms. Rowley, 458 U.S. at 205, 102 S.Ct. at 3050. After a thorough analysis of the Act and its legislative history, the Court set forth the statutory definition by holding that a "free appropriate public education" "consists of access to specialized instruction and related services which are individually designed to provide educational benefit to the handicapped child." 458 U.S. at 201, 102 S.Ct. at 3048.[5] However, the Court explicitly declined "to establish any one test for determining the adequacy of educational benefits conferred upon all children covered by the Act." 458 U.S. at 202, 102 S.Ct. at 3049. Instead, the opinion in Rowley limited its substantive review to the facts of that case, which concerned the educational needs of a deaf child performing above average in a regular classroom. Id. The facts here are considerably more challenging.
 
 
 45
 In the context of the severely handicapped, a district court in this circuit has held that a child is entitled to an extended school year if it would be not merely "beneficial but ... a necessary component of an appropriate education for [the child]." Rettig v. Kent City School Dist., 539 F.Supp. 768, 778 (N.D.Ohio 1981), aff'd in part, vacated in part on other grounds, 720 F.2d 463 (6th Cir.1983). More specifically, an ESY "would be appropriate if it would prevent significant regression of skills or knowledge retained by [the child] so as to seriously affect his progress toward self-sufficiency." 539 F.Supp. at 778-79. Under this standard, the district court in Rettig held that an ESY was not necessary because the child regressed at the beginning of the regular school year even after attending a summer program and at various times throughout the year. 539 F.Supp. at 779. On appeal, this court briefly affirmed this aspect of the district court's decision by stating that a summer program was "not necessary to permit [the child] to benefit from his instruction." Rettig, 720 F.2d at 466.
 
 
 46
 The district court in the present case cited and followed the standard of the district court in Rettig in determining that Chance would benefit from but did not need an ESY. The court explained that "[t]here is no evidence that Chance would suffer significant regression of skills or knowledge without a summer program." Opin. at 10-11. The Cordreys and amici attack this holding and the underlying standard on a variety of fronts and propose other standards allegedly more faithful to their statutory source. To resolve this issue, we turn to Rettig.
 
 
 47
 Both parties and all amici agree that under the standard in Rettig, a child must prove his need for an ESY empirically, based on evidence of prior regression and slow recoupment without summer programming. As we have observed, the Cordreys and amici object that this standard is too narrow and unfair. Such a standard, they argue, works particularly harsh results where parents have provided an extended school year to their child on their own. These parents would be forced either to allow their child to regress without an ESY (thus empirically proving his need for one) or to provide on their own what they believe their child needs to make reasonable progress and is entitled to by the Act. The Third Circuit has condemned this "Hobson's choice" by rejecting, in dicta, the rule that a child must first show regression in order to demonstrate need. Polk v. Central Susquehanna Intermediate Unit 16, 853 F.2d 171, 184 (3d Cir.1988).
 
 
 48
 Evergreen's responses are twofold. First, absent hard empirical proof, a finding that a child needs an ESY could be based only on generalized statements regarding children afflicted with such a handicap. As all the experts testifying in this case agree, regression and recoupment patterns vary greatly among similarly handicapped children. Accordingly, to provide an ESY on such generalized rationale is to ignore the Supreme Court's emphasis in Rowley that an IEP must be based on an individualized assessment of the child. See 458 U.S. at 201, 203, 102 S.Ct. at 3048, 3049. Second, Evergreen continues, unless hard empirical data are required, parents can force a school district to provide an ESY by providing one for their child independently and thereby preventing the district from later showing that the child will not regress without it.
 
 
 49
 How "hard" the evidence of regression must be has apparently never been directly addressed by a court or administrative review board. In Rettig, the only decision from this circuit addressing whether a child was entitled to an ESY, the child participated in summer educational programs for most if not all of the several previous summers, including the one immediately preceding the lawsuit. As in the present case, there was thus little if any evidence of the child's prior regression absent an ESY. See Rettig, 539 F.Supp. at 774-75. Had the district court in Rettig or this court on appeal concluded that a child's entitlement to an ESY depended on proof of actual prior regression, it would have been easy for either to have simply said so. Neither did. Also, at least one other circuit apparently has allowed less-than-definitive proof of regression under a standard quite similar to that in Rettig. See Alamo Heights Indep. School District v. State Bd. of Education, 790 F.2d 1153, 1156-58 (5th Cir.1986) (affirming the judgment below that a child who had received an ESY privately for several years was entitled to an ESY under the Act); see also Armstrong v. Kline, Civ. Act. Nos. 78-172, 78-132, 78-133, Remedial Order # 2 (E.D.Pa. Sept. 5, 1979) (enunciating detailed regression standard for ESY eligibility, under which "empirical data, if any" is only one source of information); but see Bales v. Clarke, 523 F.Supp. 1366, 1371 (E.D.Va.1981) (stating without discussion that a child must "show[ ] an irreparable loss of progress during summer months" in order to receive an ESY).
 
 
 50
 The advantages of a "hard empirical proof" rule are obvious. It is clearer and simpler to apply than reliance on conflicting non-empirical expert opinion. It gives parents an incentive to raise and resolve the issue of whether an ESY is necessary before they independently provide one to the child, when the child's regression and recoupment without an ESY can be assessed. At the same time, a policy based upon discouraging parents from structuring a child's summer months solely to gain proof of need for an ESY seems at best unfair. It seems equally unfair to penalize a child previously enrolled in private summer programs but whose situation later deteriorates so that he now might qualify for a publicly-funded ESY. Such a penalty would be at odds with the objectives of the Act as expressed in Burlington School Comm'n v. Massachusetts Dep't of Education, 471 U.S. 359, 373, 105 S.Ct. 1996, 2004, 85 L.Ed.2d 385 (1985): "The Act was intended to give handicapped children both an appropriate education and a free one; it should not be interpreted to defeat one or the other of those objections." Clarity and ease of application therefore must give way. Resolution of conflicting expert opinion is hardly unique to this field of law and should not be unduly troubling.
 
 
 51
 Further, Evergreen's fear that it could be boxed in by parents who present the district with ESY programming as a fait accompli seems exaggerated. While it is true that the district would be denied its best case against an ESY, in such a case it may still rely and, as the ultimate holding in this case illustrates, prevail on the basis of expert testimony and overall proof. Finally, the concern of the Cordreys and amici that a regression/recoupment standard, strictly defined, would stray too far from its statutory source and take on a life of its own has some merit. Professional opinions not based solely on empirical observations are less precise, to be sure, but they may in a proper case be as faithful or even more faithful to the Act's general substantive requirement of "some educational benefit" to the child.
 
 
 52
 In conclusion, then, the regression standard in Rettig and like cases is best interpreted not to require absolutely that a child demonstrate that he has regressed in the past to the serious detriment of his educational progress in order to prove his need for a summer program. Instead, where there is no such empirical data available, need may be proven by expert opinion, based upon a professional individual assessment.
 
 
 53
 Once the content of a proper regression standard as stated in Rettig is clarified, the alternatives proposed by the appellants and amici lose their persuasive force. One such standard is cited from the literature in the special education field, in which the regression/recoupment standard is widely questioned or rejected. Allegedly more professionally sound, this alternative standard inquires whether an ESY is "critical to ongoing student progress." Browder, Lentz, Knoster and Wilansky, "Determining Extended School Year Eligibility: From Esoteric to Explicit Criteria," 13 J. of Assoc'n for Persons with Severe Handicaps (No. # 4) 235, 242 (1988). The authors of this paper advise that need for an ESY should focus not on ill-defined terms such as regression and recoupment, but instead on measurement of explicit criteria that affect a student's ability to maintain his progress towards his IEP goals. Id. at 236, 242. Appellants advance a similar alternative from ESY guidelines recently issued by the Ohio Department of Education. The guidelines do not specifically mention regression or recoupment and instead would have the IEP team consider whether the child "is failing, or is likely to fail, to achieve short-term instructional objectives on the IEP due to interruption of instruction between school years." (Addendum E-4 to Appellants' brief, at 2.) However, if the existing regression-based standard for ESY is defined loosely to allow for individualized expert opinion and not just empirical predictions based on actual prior regression, the standard would seem flexible enough to accommodate such refinements in professional understanding of when a child needs an ESY. The focus of Rettig is clearly on the child's educational "progress," Rettig, 539 F.Supp. at 779, and "benefit," Rettig, 720 F.2d at 466. The ESY standard should be open to developments in special education science, but not bound to any particular one.
 
 
 54
 The Cordreys also propose that the Rettig regression standard should be broadened to the multi-factored inquiry articulated by a federal district court in an unpublished decision in Lee v. Thompson, Educ.Handicapped L.Rptr. 554:429 (D.Haw.1983). There it was held that factors relevant to whether an ESY is proper include the nature and severity of the handicap; the areas of learning crucial to progress towards self-sufficiency; and the extent of regression and the rate of recoupment following an interruption in programming. Id. at 430. Again, however, since the regression/recoupment standard in Rettig is not limited to empirical proof, the analysis suggested by Lee does not differ significantly.[6]
 
 
 55
 Beyond the verbal formulation of a substantive standard for ESY entitlement, the actual dispute in this case seems to center on a more fundamental issue: what is the role of an ESY within a "free appropriate public education" under the Act? Evergreen believes that the purpose of ESY programming is to allow the student to maintain the progress achieved during the regular school year. The Cordreys and amici, on the other hand, endorse the broader view of the court in Lee: ESY is no mere "backstop" to a regular school year, but should be "regarded as one additional means of providing a handicapped child with specialized instruction in accordance with his [IEP]." Lee at 554:430.
 
 
 56
 In the Cordreys' favor, it does seem arbitrary to assume even provisionally that the regular 180-day school year designed for normal learning abilities could also meet the unique needs of a severely handicapped child. On the other hand, as the Third Circuit has noted, "needs are necessarily determined in reference to goals." Battle v. Pennsylvania, 629 F.2d 269, 276 (3d Cir.1980). Rowley makes clear that in choosing goals for a handicapped child and appropriate levels of service to meet these goals, a school district is required not "to maximize each handicapped child's potential," 458 U.S. at 199, 102 S.Ct. at 3047, but rather to provide "some educational benefit" to the child. 458 U.S. at 200, 102 S.Ct. at 3047-48. We have no doubt that the realities of care and education of handicapped children will assure that the issue of whether a child should receive an ESY as part of the IEP will cause continued friction and litigation between parents and schools, and that the heavy custodial responsibilities of parents during the summer vacation months will conflict with the heavy financial drain upon the public fisc by a liberal attitude toward providing an ESY. Harmonizing the concerns poses no easy task. The best rule is that which recognizes that the school district has no purely custodial duty to provide for handicapped children while similar provision is not made for others. We therefore begin with the proposition that providing an ESY is the exception and not the rule under the regulatory scheme. Given those policy considerations, therefore, it is incumbent upon those proposing an ESY for inclusion in the child's IEP to demonstrate, in a particularized manner relating to the individual child, that an ESY is necessary to avoid something more than adequately recoupable regression.
 
 
 57
 More specifically, it must be shown that an ESY is "necessary to permit [the child] to benefit from his instruction." Rettig, 720 F.2d at 466. The Third Circuit has persuasively held that this benefit must be more than merely de minimis, gauged in relation to the child's potential. Polk, 853 F.2d at 182, 185. See also Alamo Heights, 790 F.2d at 1158 (quoting Battle, 629 F.2d at 282 (Van Dusen, J., concurring)) ("[t]he some-educational-benefit standard does not mean that the requirements of the Act are satisfied so long as a handicapped child's progress, absent summer services, is not brought to a 'virtual standstill' "). The court in Polk also noted that for a handicapped child with severely limited potential, in contrast to a handicapped child such as the deaf plaintiff in Rowley, progress beyond an inadequate de minimis level may as a practical matter "require optimal benefit." 853 F.2d at 184. In such cases, it seems particularly apt to consider the Polk court's counsel that the child's educational progress "can be understood as a continuum where the point of regression versus progress is less relevant than the conferral of benefit." Id. Whatever the child's handicap and potential, however, the inquiry is essentially the same. If the child benefits meaningfully within his potential from instruction under a proper IEP over a regular school year, then ESY service may not be required under the Act unless "the benefits accrued to the child during the regular school year will be significantly jeopardized if he is not provided an [ESY]." Alamo Heights, 790 F.2d at 1158. In the latter circumstance, "the educational program offered by the School District [will] not meet the 'some educational benefit' standard of Rowley." Alamo Heights, 790 F.2d at 1159.
 
 
 58
 We conclude therefore that it is best to hold that the regression standard for an ESY in Rettig, as we have interpreted it here, is consistent with the Act and with Rowley. Worthy as the goal of providing unlimited services to handicapped children may be, courts must apply the Act as it was written and is interpreted by the Supreme Court. As one district court has commented:
 
 
 59
 An appropriate education is not synonymous with the best possible education.... It is also not an education which enables a child to achieve his full potential: "even the best public schools lack the resources to enable every child to achieve his full potential." Rowley v. Board of Education, 483 F.Supp. 528, 534 (S.D.N.Y.1980)[, aff'd, 632 F.2d 945 (2d Cir.1980), rev'd, 458 U.S. 176 [102 S.Ct. 3034, 73 L.Ed.2d 690] (1982) ]. Plaintiff's parents are seeking an ideal education for their child. Their aspirations are understandable, even admirable. But neither they nor any other parents have the right under the law to write a prescription for an ideal education for their child and to have the prescription filled at public expense.
 
 
 60
 Bales, 523 F.Supp. at 1370 (citation omitted).[7]
 
 D. Applying the ESY standard in this case
 
 61
 As noted above, whether the IEP provides a "free appropriate public education" is a question subject to review de novo, while factual determinations by the district court are accorded deference unless clearly erroneous. The factual questions here are Chance's tendency to regress, prior regression, ability to recoup lost skills, and progress toward his educational goals. The legal question is whether these facts meet the standard of significant skill losses of such degree and duration so as seriously to impede his progress toward his educational goals.
 
 
 62
 In this case, the district court found, as Chance's teacher's testified, that he lost some skills during the week or over a weekend, and that it was not uncommon for other non-handicapped children to lose skills over the summer vacation. The court also cited testimony by the Fulton County Board of Education psychologist that Chance suffered regression throughout the school year, such as after a weekend or Christmas vacation, and that in her opinion, Chance did not need an ESY. The court also noted Dr. Pittner's report, which states that Chance might regress in his behavior with as well as without an ESY, but that his risk of regression without an ESY would be unacceptable. From these findings, the district court concluded:
 
 
 63
 There is no evidence that Chance would suffer significant regression of skills or knowledge without a summer program. This child lost skills throughout the school year. Thus, an ESY program would be beneficial for Chance, but it is not necessary to prevent significant regression of his progress toward self-sufficiency.
 
 
 64
 Dist.Ct.Op. at 11.
 
 
 65
 The Cordreys challenge this conclusion by citing other evidence in the record regarding Chance's prior experiences of regression and slow, if any, progress with regard to certain skills and behavior affecting these skills. They emphasize that Evergreen had agreed with the Cordreys to settle whether Chance should receive an ESY by having Dr. Pittner examine Chance and recommend whether an ESY was appropriate. Since Evergreen did not specify any criteria for his recommendation, the Cordreys claim, Evergreen may not now reject it. For its part, Evergreen attacks the soundness of Dr. Pittner's report, objecting particularly that he failed to utilize available comparative empirical data to assess Chance's educational progress; that he discussed only Chance's capacity to regress and not to recoup; and that he failed to consult school psychologists familiar with Chance. Evergreen cites evidence which indicates that over the month-long interruption in programming between his private ESY program and the regular school year, Chance retained some skills and lost but adequately recouped others. Evergreen also reiterates that in the opinion of the school psychologists, Chance has been progressing toward his IEP goals at a rate expected for his potential, which is admittedly slow. In response, the Cordreys dispute whether the available empirical data were meaningful and defend the soundness of Dr. Pittner's study.
 
 
 66
 Thus, the testimony regarding to what degree Chance would regress without a summer program was directly conflicting. The district court concluded from this that there was "no evidence that Chance would suffer significant regression" without an ESY. If by this conclusion the court required that his "need" for an ESY be proven purely by empirical evidence, we would be inclined to remand for further evaluation of the facts against the standard articulated here. Yet we do not believe that the district court's view was so narrow.
 
 
 67
 The better interpretation of the district court's conclusion is that because Chance regressed throughout the regular school year, the evidence did not show that his further summer regression would be relatively significant. Thus, an ESY would benefit him, but would not be necessary to preserve the benefits he was already receiving from his regular school year programming despite his continual regression. This conclusion draws support from the court's findings of fact and the record. Since Dr. Pittner's report did not address Chance's capacity for recoupment, the district court could legitimately rely on Chance's prior recoupment patterns and on the opinions of the school psychologists long familiar with Chance that his progress, slow as it is, does not depend on his privately-provided ESY programming. Cf. Alamo Heights, 790 F.2d at 1159 (in the face of expert disagreement over whether the child would regress significantly without an ESY, the district court's finding in the affirmative was clearly supported even if not compelled by the record). We therefore affirm the district court's conclusion that Chance is not entitled to an ESY under the Act.
 
 
 68
 Although Evergreen contends that it is not obliged to provide Chance with a summer program, it has nevertheless provided one or related assistance by reimbursing the Cordreys for their 1985 and 1986 costs and by directly assuming those costs in 1987-1989. This service, however, was provided under the explicit understanding that the summer program was not part of Chance's IEP and hence not subject to the stay-put provision. As we have noted earlier, to the extent the facts of Chance's development and condition were such as to prompt Evergreen to furnish him with an ESY, it was error for the school district to have offered to provide it within his IEP only by exacting from his parents their agreement to exclude it from the protection of the stay-put provision. On the other hand, since we have upheld the trial court's finding under the particular facts here that Evergreen was not legally bound to provide him an ESY, its decision to move beyond the strict obligations of the statutory scheme can only be viewed as laudable and we see nothing in the Act or this decision to prevent it.
 
 V.
 
 69
 The Cordreys' complaint included a claim that Evergreen discriminated against Chance on the basis of his handicap, in violation of section 504 of the Rehabilitation Act, 29 U.S.C. Sec. 794. The district court's opinion did not expressly address this claim. It is evident that consideration of this claim somehow fell between the cracks. In view of the undisputed evidence before the court, we conclude that we may fairly resolve this issue without the time and expense of a remand.
 
 
 70
 The claim consists of three allegations. First, the Cordreys allege that any deaf child in the Evergreen school district is automatically eligible to receive ESY services, while severely handicapped children such as Chance must demonstrate need in order to participate in the Fulton County summer program. Evergreen flatly denies this, and states that the county invites any handicapped child to enroll in its ESY. The Cordreys also allege that the summer program discriminates by segregating handicapped children from non-handicapped children within the program. Evergreen responds that intermingling of handicapped and non-handicapped children is necessarily limited because few non-handicapped children attend school beyond the regular school year. This response, like all Evergreen's responses on the discrimination claim, went unrebutted on appeal. The evidence in the record unquestionably is inadequate to satisfy the Cordreys' burden of proof here. Finally, the Cordreys claim that Evergreen discriminated by failing to provide Chance with an ESY. This claim stands or falls with their claim under the Education of the Handicapped Act. Since we have upheld the district court's ruling that the denial of the ESY was proper, there is nothing further in the record to suggest that its denial was discriminatory within the meaning or intent of the Rehabilitation Act.
 
 
 71
 AFFIRMED.
 
 
 
 [1]
 An ESY is an organized program beyond the regular 180 day school year
 
 
 [2]
 On appeal, Evergreen continues to maintain that the meeting was not an IEP meeting. We accept the trial court's finding to the contrary as not clearly erroneous
 
 
 [3]
 See also Sec. IV-B infra, rejecting the Cordreys' claim that Evergreen had agreed to provide an ESY in the parties' 1986 Agreement and Mutual Release
 
 
 [4]
 See Sec. III-B-3-b, supra
 
 
 [5]
 The Court also phrased the requirement as "sufficient to confer some educational benefit upon the handicapped child." 458 U.S. at 200, 102 S.Ct. at 3048
 
 
 [6]
 At least as much is demonstrated by Armstrong v. Kline, supra, in which the court decreed that a student is entitled to an ESY if "regression caused by an interruption in educational programming, together with the student's limited recoupment capacity, renders it impossible or unlikely that the student will attain the level of self-sufficiency and independence from caretakers that the student would otherwise be expected to reach in view of his/her handicapping condition." Id., Remedial Order # 2. The order further provided that this standard was not to be strictly construed only on the basis of "empirical data" and listed as relevant to applying the standard the identical factors enumerated in Lee
 Appellants also claim that the Fifth Circuit's opinion in Alamo Heights states a superior alternative to a regression/recoupment standard. Yet this claim is belied by the language of the decision: "If a child will experience severe or substantial regression during the summer months in the absence of a summer program, the handicapped child may be entitled to year-round services." Alamo Heights, 790 F.2d at 1158. It is therefore clear that Alamo Heights in whole does not substantially differ from Rettig.
 
 
 [7]
 We emphasize that our agreement with the Bales court does not extend to its empirical standard of proof for ESY entitlement. See supra