*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206

ELECTRONIC CITATION: 2004 FED App. 0302P (6th Cir.)
File Name: 04a0302p.06

# UNITED STATES COURT OF APPEALS

### FOR THE SIXTH CIRCUIT

_____

KENTON COUNTY SCHOOL
DISTRICT,

     *Plaintiff-Appellant,*

     *v.*

JEFFREY HUNT and LYNN
HUNT,

     *Defendants-Appellees.*

Nos. 02-6027/6028

Appeal from the United States District Court
for the Eastern District of Kentucky at Covington.
Nos. 01-00138; 01-00139—William O. Bertelsman,
District Judge.

Argued: March 18, 2004

Decided and Filed: September 9, 2004

Before: KENNEDY, ROGERS, and COOK, Circuit
Judges.

_____

### COUNSEL

**ARGUED:** Richard G. Meyer, DETERS, BENZINGER &
LAVELLE, Covington, Kentucky, for Appellant. Randy J.
Blankenship, ROBBINS, KELLY, PATTERSON &
TUCKER, Cincinnati, Ohio, for Appellees. **ON BRIEF:**
Richard G. Meyer, DETERS, BENZINGER & LAVELLE,
Covington, Kentucky, for Appellant. Randy J. Blankenship,
ROBBINS, KELLY, PATTERSON & TUCKER, Cincinnati,
Ohio, for Appellees.

_____

### OPINION

_____

  KENNEDY, Circuit Judge.  In this Individuals with
Disabilities Education Act ("IDEA") case, Plaintiff Kenton
School District ("District") appeals the order from the district
court that upheld the decision by the Kentucky Exceptional
Children Appeals Board ("ECAB") requiring the District to
reimburse Jason Hunt's parents for expenses relating to (1)
his summer placement at two different programs in 1997 and
1998; and (2) his year-long placement at Chileda
Rehabilitation Institute during 1999-2000. The district court
agreed with the ECAB that the District failed to provide Jason
Hunt with a free appropriate public education ("FAPE")
during all years in question and that the reimbursement was,
therefore, required. On this appeal, the District argues that
the district court and the ECAB improperly decided issues
that were not raised before the hearing officer, who found in
favor of the District. We reverse because neither the ECAB
nor the district court conducted a full factual inquiry into (1)
whether Jason Hunt needed extended school year ("ESY")
services to justify summer programs in 1997 and 1998; (2)
whether Jason's individualized education program ("IEP")

denied him FAPE for the 1999-2000 school year, warranting a private placement; (3) whether the District, with additional evidence presented in the district court, established that the IEP for 1999-2000 was not deficient; and (4) whether that evidence should have been presented in earlier proceedings before the hearing officer and the ECAB.

## BACKGROUND

This case involves a reimbursement claim under the IDEA. Parents of Jason Hunt filed a claim seeking reimbursement for expenses related to (1) their decision to place Jason in a behavior management program at Bancroft Rehabilitation Center in New Jersey ("Bancroft") for 12 weeks in the spring and summer of 1997, (2) their decision to place Jason in a summer program at Chileda Rehabilitation Institute in LaCrosse, Wisconsin ("Chileda"), and (3) their decision to place Jason at Chileda from March 1999 through August 2000.

Jason Hunt was born in Houston, Texas on July 27, 1988. He has been diagnosed as having (1) double spastic hemiplegic cerebral palsy with greater right sided involvement and (2) delayed cognitive and communication development. As a result, it was recommended that Jason be enrolled in an integrated developmental preschool program with a strong language component. Jason enrolled in preschool in the Kenton County School District on August 26, 1992. Since behavior was a continuing issue for Jason, behavior plans were developed and implemented in 1993, 1994, and 1995. His toileting needs were addressed in an IEP for the 1993-94 school year. The District determined that he was a student with disability, and that he qualified to receive a free appropriate public education. On October 26, 1992, an individualized education plan was developed for Jason. Mr. and Mrs. Hunt placed Jason at the Redwood Rehabilitation Center ("Redwood") during the summers of

1992-1995.[1] Julie Tyner, the student's teacher and the principal of Redwood for 14 years, testified that Redwood is a recreational program that uses no IEP's for students, nor do they have behavior management plans.

Jason began the 1996-97 school year at White's Tower Elementary ("White"). His IEP, dated October 2, 1996, included the following goals: (1) to improve intelligibility through correct speech sound production; (2) to improve expressive language skills; (3) to improve personal skills (greeting another person); (4) to improve reading comprehension skills; (5) to improve cutting skills; (6) to improve eating habits; (7) to improve writing skills; and (8) to improve math skills (time and money). Related services included occupational therapy ("OT") (both direct services and consultation), speech therapy, and daily transportation. Mrs. Hunt signed the Conference Summary (containing minutes of the meeting) and indicated that Parent's Rights were explained and a copy was given to her. On April 24, 1997, an Admission and Release Committee ("ARC") meeting was held at parents' request "to discuss OT and progress." Apparently, Mr. and Mrs. Hunt felt that their son was regressing in fine motor skills and behavior due to lack of direct OT services, despite the implementation of the IEP. They also had concerns about toilet training and behavior. As a result of the meeting, ARC changed OT to direct service and added toilet training to the IEP for the 1997-98 school year. To facilitate the accomplishment of toilet training, it was decided that Jason's parents would meet with Dr. Perkins

---

[1] The due process hearing officer noted that "[t]estimony was given that the student was placed for participation in a recreational program that the parents felt provided structure and socialization for the student in the summers of 1994, 1995, 1996." J.A. at 26. The hearing officer discounted the inconsistency, stating that "[r]egardless of specific dates of attendance, Redwood was a full day program, and the student placed there by his parents, attended from two to five days a week for three weeks each year in attendance." *Id.*

to discuss the possibility of funding for the Bancroft program.[2] A parent was present at this meeting and signed the Conference summary.

Jason was placed by his parents at Bancroft in the Neurobehavioral Stabilization Unit from April 28, 1997 until July 20, 1997. Upon his return home, two of his teachers from White, Janet Fay and Mike Burdge were trained in the implementation of the program by a Bancroft representative. Upon completion of training they seemed knowledgeable and enthusiastic about the treatment plans, and felt the school would be able to successfully implement all aspects of the treatment. Gil Damon, behavioral team leader from Bancroft, did testify that he expected "in an unstructured environment without any treatment, that Jason's rates would go back to baseline" and that they "did not replicate what his academic schedule would be in the school district." J.A. at 28.

Jason continued his education at White during the 1997-98 year. Janet Fay and Mike Burdge were his teachers. A new IEP was developed on October 13, 1997 for the upcoming school year. It included the following goals: (1) improving math skills with coins and time; (2) improving social skills by decreasing tantruming; (3) improving vocational functioning by buttoning and snapping; (4) improving written expression by writing legibly; (5) improving reading and comprehension; (6) improving expressive language skills; and (7) improving expressive communication by using correct speech sound production. Related services included speech therapy of sixty minutes a week, occupational therapy in two 30-minute sessions a week, and daily transportation services. The Conference Summary, dated October 13, 1997, indicated that a meeting was called to review the current program and

---

[2] Bancroft claimed that it could toilet train Jason, reduce his behaviors by 80%, and make him drug-free (Jason was taking Ritalin) as part of its twelve-week one-on-one program.

discuss behavior issues. The summary noted that the Bancroft program was being used by the school personnel. However, it took three adults to carry out all the necessary procedures and Jason would be very angry after they were done. It also noted that he seemed to have a very difficult time in the inclusionary classroom setting, and appeared to be over-stimulated by the regular classroom. On the other hand, the summary noted that there were notable improvements in language skills, self-help skills, hand-writing, and toilet-training. It was decided at the meeting to "[d]evelop new IEP within self-contained sp[ecial] ed[ucation] setting; use three step approach to behavior compliance (Bancroft) without visual screening."[3] Jason's mother was present and signed the Conference Summary report.

On March 11, 1998, an ARC was convened to review Jason's program. It was decided that placement would continue as Multiple Disabilities with assistive technology adaptations. Both parents attended this meeting and agreed that the transition to the regular classroom should begin, that Jason had "improved behaviorally," and that he "is doing well in reading and spelling." One of the parents signed the Conference Summary. An ARC was convened on March 26, 1998, to discuss behavior issues. The IEP was reviewed on that date and it was decided that the school would "temporarily reduce math time and allow medication changes to take effect." His parents were present and signed the Conference Summary. Another ARC was convened on June 1, 1998, to discuss re-evaluation results. As an explanation for rejecting the ESY option, the following

---

[3] Gil Damon, a former behavioral team leader at Bancroft testified at the Due Process Hearing that visual screening involved "crossing Jason's hands, crossing Jason's arms and controlling, gaining control of his arms with one of your arms and using your other hand to place over his eyes, putting an index finger on the brow so as not to cause any injury to the eye but basically to restrict Jason's sight." Damon Dep. at 32, J.A. at 1721.

statement was written: "No data to support this."[4]  Other comments were: "His mother and teacher reported improvements in bathroom skills. Jason will attend summer school at Chileda . . ." Mrs. Hunt testified that the " . . . [b]ehavior was an on-going problem and I felt like during the summer if he didn't have a highly structured program where we worked on his behavior as well as his social interaction that he would not do very well at the beginning of the school, the following school year."

Jason attended the summer program at Chileda from June 15 until August 19, 1998. Chileda teacher, Chris Schalow, prepared a "Music Summary"; it was noted that "social skills have improved as far as the sharing, turn taking, being OK with others choosing activities." Edith McBain, another Chileda person, noted that Jason "does extremely well working independently. He displays several negative behaviors when forced into group participation activities. My recommendation to ensure success for Jason is to have him work independently or with a very small group setting."

Jason returned to White for the 1998-99 school year. The ARC met on September 16, 1998, to conduct an annual review and develop the IEP. A parent was present and signed the Conference Summary. The Summary noted:

> Academic goals and objectives were accepted after a review of last year's IEP. Mr. Burdge reviewed behavior data. Transitioning times appear to be better this year. Teachers and parents report improvement since stopping

---

[4]On the topic of ESY, the hearing officer listened to testimony from Mike Burdge, Jason's teacher and State Coordinator for the Kentucky Alternate Portfolio Assessment, Linda Kelly, the school district's head of psychological services, and Mr. Hunt, Jason's father. The hearing officer concluded that "there is no evidence that his IEP was not appropriate to the needs of the student, or that ESY services were required in order for the student to receive a FAPE." J.A. at 40.

medication adderol. Touching and spitting behaviors are primary behavior concerns. Using redirection seems to work best. The student is interacting with peers 59% of the time each day. The student does not qualify for extended school year services. Parents expressed their feelings that we don't really have sufficient data to qualify him because they personally fund his summer programs. . . Discussion initiated by Mr. Burdge concerning the need for consultative assistance on the student. Mrs. Tyner suggested that Mr. Burdge contact Dr. Lentz to see if he will enter into a limited contract for seeing the student and working without staff. Mr. Burdge will explore this option with help from Mr. Hughes and the outcome reported to Mrs. Tyner. Other contacts will also be explored through the No. KY Co-op and personal contacts.

An IEP was developed with goals in the following areas: (1) improve speech sound production and use; (2) improve expressive language skills; (3) improve social competence in the area of behavior; (4) improve academic performance in the areas of reading and writing; and (5) improve academic performance in the area of math (money and time). The ARC chose placement in part-time regular/part-time special education classes.

After the September 16, 1998, ARC meeting, Jason began engaging in forced vomiting, both at home and at school. He was admitted to Franciscan Hospital for self-induced vomiting, headbanging (at home only), and history of smearing feces. The discharge summary noted that he had recently "returned from a specialized behavior program in Wisconsin which he had attended through the summer because of his parents' difficulty managing him. His parents were hoping to have him return to that facility from the hospital." While Jason was in the hospital, another ARC meeting was held on October 20, 1998, at the parents' request, to discuss behavior concerns and placement. The

parents and, it appears for the first time, their attorney was present. There was no discussion of ESY because of the placement issues. Jason's parents expressed their intent to place Jason in a residential facility upon his release from the hospital at public expense. The following were their reasons for residential placement: (1) concern that there was a general delay in behavioral skills affecting his academic performance as compared to summer residential program at Chileda; (2) residential placement allows for development of adaptive behaviors with peers which is not being done effectively at White; (3) concern that other more serious maladaptive behaviors might develop if Jason returned to the present program at White; (4) the White placement does not include a full-time certified staff member through the IEP to work one-on-one with the student in an integrated setting.

On March 8, 1999, Mr. Hunt sent a letter to Dr. Perkins, notifying him that Chileda would have an opening for his son on March 19, 1999 and further expressing his dissatisfaction with the White program because "Jason is not receiving an appropriate free education in which his special needs are met. As you are aware his IEP goals are not being met and his current placement has resulted in maladaptive behavior. We are very unhappy in the current placement, which has Jason in a room with an aide (non-certified staff member)." On March 16, 1999, Mr. Hunt sent another letter to Dr. Perkins requesting copies of Jason's records to facilitate his enrollment at Chileda. Additionally, Mr. Hunt requested "Kenton County's written position on paying the proportionate amount of state and federal funds received by Kenton County to assist in the placement at Chileda in accordance with the [IDEA] for education at the Chileda Institute." Mr. Hunt also informed Mr. Perkins that the family intended to file a formal complaint with the state Division of Exceptional Children's services regarding the following items: (1) that Jason should never have been placed in such a highly restrictive environment; (2) that he should have been placed in the least restrictive environment which

would be a small group setting in which he has performed exceptionally well during two summer private placements; (3) that when the option of least restrictive environment was discussed at the March, 1998 ARC meeting, the parents were told that Kenton County did not have, nor have access to, such a facility, making this option wholly unavailable; and (4) that Kenton County had refused "to provide or assist in payment for an extended school year from 1995 to 1998 on the unsubstantiated premise that there was no apparent decline in academic performance and behavior, while we and some of his educators have observed a substantial increase after Jason's return to the Kenton County school system from two private placements during the summers of 1997 and 1998."

On March 18, 1999, Dr. Perkins responded, in a letter, to Mr. Hunt's accusations. Dr. Perkins expressed the opinion that Kenton County had both the ability and the desire to provide Jason with an appropriate education. He indicated that the White staff cared about Jason and worked very diligently to provide one of the finest Special Education programs in the District. He also thought that, with respect to outside placement, the White program was appropriate for Jason but that they, nevertheless, recommended that Jason's parents seek assistance from several agencies, including IMPACT and Comprehensive Care to better meet Jason's needs. Dr. Perkins concluded: "My information is that you have chosen not to use these resources, but chose to pursue residential placement of your own. I fully realize that you want to provide Jason with the best experiences and support that you can. However, the Kenton County Schools will not provide financial support for a private program chosen by a parent outside of the school setting."

On March 22, 1999, Jason's parents enrolled him at Chileda, where he remained until August 20, 2000.[5] In anticipation of Jason's enrollment as a 6th grader at Turkey Foot Middle School in 2000-01, an ARC meeting was held on May 8, 2000 to develop an IEP. Mrs. Hunt was present at the meeting. She requested an ESY program for the summer of 2000 and an answer by May 15, 2000. Mrs. Hunt was informed that since Jason was not a current student, her demands would not be met. She was also told, however, that the central office would make the final decision on this matter. In response to Mrs. Hunt's concerns about the use of aides, Gina Tello, a special education teacher who prepared the 2000-2001 IEP, told her that her 2.5 aide staff was ample to provide the one-on-one assistance situations that may arise, and that peer tutors were to be utilized as well. Mrs. Tello adopted the Chileda plan as a basis for the IEP with the following goals: (1) math skills in the area of money and time; (2) reading and writing skills in the areas of comprehension and letter formation; (3) social skills in the areas of interpersonal relations and behavior; and (4) personal safety and self-help in the areas of community and toileting. Another ARC meeting was held on May 18, 2000, to discuss summer programming with parents present. It was agreed that ESY was needed but no decision on how to accomplish it was reached. Dr. Perkins offered either (1) the possibility of providing a staff member to work with Jason during the summer or (2) programs at Redwood. Jason's parents were opposed to the Redwood program, insisting that they needed a program that included behavioral and more academic focus. With respect to OT services, Dr. Perkins discussed a program at Ft. Wright that would facilitate this. However, the parents did not want a part-time program, insisting that only a full-time program was consistent with the IEP developed by Chileda. The parents suggested the option of attending Chileda during the summer at public expense. Dr. Perkins

---

[5]Evidently, Jason's parents signed a one-year contract for services.

insisted that he could offer an appropriate program within the Kenton County system

On May 23, 2000, a proposed ESY program for the summer of 2000 was faxed to the parents. The plan included the following features: (1) a certified teacher providing instruction in all goals of the May 8, 2000 IEP for three days a week for 8 weeks beginning June 6th and ending July 27th; (2) an experienced instructional assistant; (3) to ease the facilitation of behavior and social skills , 3 or 4 other students will be attending the same program and there will always be at least one other student in the classroom; (4) speech and language therapy and OT will be provided in a collaborative setting, with the time based on the same 3/5 ration as that of IEP goals. On June 1, 2000, the parents received a fax from Chileda questioning the appropriateness of the May 23, 2000 proposal because (1) it provided no formal programming in August, thereby jeopardizing his ability to integrate into the local school in the fall; (2) it provided a 3-day a week, instead of a 5-day a week, summer session; and (3) a 3 or 4 student-setting was insufficient because a 5 to 10 student-setting was more beneficial. On August 20, 2000, Jason was discharged from Chileda.

On January 9, 2001, a due process hearing was requested on Jason's behalf. The Division of Exceptional Children Services received the request on January 11, 2001 and assigned Ms. Patricia M. Guthrie as the Hearing Officer on January 25, 2001. The Hearing Officer ruled in favor of the District on all claims, as follows: (1) the District did not deny FAPE to Jason Hunt for the 1996-97 school year and ESY services were not required for Jason to receive a FAPE; (2) the parents were not entitled to reimbursement for the costs associated with placement at Bancroft; (3) the District did not deny FAPE to Jason for the 1997-98 school year and ESY services were not required for Jason to receive a FAPE; (4) the District did not deny FAPE to Jason for the 1998-99 school year and ESY services were not required for Jason to

receive a FAPE; (5) the parents were not entitled to reimbursement for the costs associated with placement at Chileda during the time of March 22, 1999 through the summer of 1999; (6) there was no denial of FAPE with respect to the District's failure to develop an IEP for the student for the 1999-2000 school year because Jason was not enrolled in the District; (7) the parents were not entitled to reimbursement for the costs associated with placement at Chileda during the time of March 22, 1999 through the 1999-2000 school year; (8) the District did not deny a FAPE to Jason in the summer of 2000 because it offered an appropriate ESY program that the parents refused; and (9) the parents were not entitled to reimbursement for the costs associated with placement at Chileda for the summer of 2000. The parents appealed to the Division of Exceptional Children on April 23, 2001, which reversed the decision by the hearing officer. Rather than confine its analysis to the issues litigated by Jason's parents before the hearing officer, the ECAB concluded that Jason was denied a FAPE for all the years he was at White because his IEPs at White were not individualized to his needs, did not contain measurable goals, and did not adequately address his behavior issues. The District appealed the ECAB ruling to the district court. The District requested a hearing under 20 U.S.C. § 1415(i)(2)(b)(ii) to address issues which it asserted were raised for the first time by the ECAB. The district court limited the hearing to two hours to be shared equally by the parties. The District presented the testimony of Mr. Burdge, Jason's teacher and State Coordinator for the Kentucky Alternate Portfolio Assessment, to address specifically the issues of how the IEPs were prepared and how to interpret them. His testimony was intended to help the court determine whether the IEPs were based on Jason's individualized needs, with significant and well-informed input from Mrs. Hunt, whether they contained measurable and measured goals, and whether they were being supplemented by behavior plans and teaching strategies that were not at the time legally required to be put into the IEPs. J.A. at 211-22, 228-29, 246-47, 258-

62. The district court affirmed the decision by the Division of Exceptional Children. The current appeal followed.

## ANALYSIS

On this appeal, the District argues that (1) in failing to follow the dictates of Sixth Circuit case law for deciding ESY issues, the district court made core findings which are clearly erroneous and warrant reversal of the judgment for Plaintiffs; (2) in deciding an issue not even properly before the court, the district court retroactively applied an IDEA regulation governing the contents of a disabled student's IEP; (3) instead of deferring to the ECAB opinion, the district court should have deferred to the opinion of the due process hearing officer on credibility issues; (4) this Court must make its own legal determination on whether the District provided a FAPE to Jason without ESY or residential placement.

### A. *Extended School Year*

The district court ordered reimbursement of expenses related to the behavior modification program at Bancroft from April to July of 1997, as well as the Chileda summer school programs in 1998 and 2000, because it found that the parents succeeded in proving Jason's need for ESY services in order to obtain FAPE. The district court also treated the residential placement at Chileda from March 1999 through May 2000 as an ESY issue, finding credible the parent's testimony that Chileda would not accept Jason into a summer program without a one-year contract.[6]

As this Court had noted on an earlier occasion, "the key substantive term of 'free appropriate public education' in the

---

[6]Since the district court conducted a very short hearing on the underlying factual issues and agreed with the ECAB, we review the underlying decision by the ECAB for error.

Act is defined in 'general and somewhat imprecise' terms." *Cordrey v. Euckert*, 917 F.2d 1460, 1470 (6th Cir. 1990) (citing *Bd. of Educ. v. Rowley*, 458 U.S. 176, 205 (1982)). According to the Supreme Court, FAPE "consists of access to specialized instruction and related services which are individually designed to provide educational benefit to the handicapped child." *Rowley*, 458 U.S. at 201. "More specifically, an ESY would be appropriate if it would prevent significant regression of skills or knowledge retained by the child so as to seriously affect his progress toward self-sufficiency." *Cordrey*, 917 F.2d at 1470 (citation omitted). After discussing several suggested methods of proof, the *Cordrey* court concluded that

> the regression standard in *Rettig* and like cases is best interpreted not to require absolutely that a child demonstrate that he has regressed in the past to the serious detriment of his educational progress in order to prove his need for a summer program. Instead, where there is no such empirical data available, need may be proven by expert opinion, based upon a professional individual assessment.

*Cordrey*, 917 F.2d at 1472. The *Cordrey* court continued:

> Beyond the verbal formulation of a substantive standard for ESY entitlement, the actual dispute in this case seems to center on a more fundamental issue: what is the role of an ESY within a "free appropriate public education" under the Act? . . . The best rule is that which recognizes that the school district has no purely custodial duty to provide for handicapped children while similar provision is not made for others. *We therefore begin with the proposition that providing an ESY is the exception and not the rule under the regulatory scheme. Given those policy considerations, therefore, it is incumbent upon those proposing an ESY for inclusion in the child's IEP to demonstrate, in a particularized manner relating to*

> *the individual child, that an ESY is necessary to avoid something more than adequately recoupable regression.* More specifically, it must be shown that an ESY is necessary to permit the child to benefit from his instruction. The Third Circuit has persuasively held that this benefit must be more than merely *de minimis*, gauged in relation to the child's potential.

*Id.* at 1472-73 (citations omitted) (emphasis added).

As we noted in *Cordrey*, "whether the IEP provides a 'free appropriate public education' is a question subject to review *de novo*, while factual determinations by the district court are accorded deference unless clearly erroneous." *Id.* at 1474. The factual questions in this case are, therefore, Jason's "tendency to regress, prior regression, ability to recoup lost skills, and progress toward his educational goals." *Id.* "The legal question is whether these facts meet the standard of significant skill losses of such degree and duration so as seriously to impede his progress toward his educational goals." *Id.*

With respect to the need for ESY in the 1996-97 school year, the hearing officer concluded that "[t]he weight of the evidence and testimony clearly provides that the school district provided a FAPE to the student, and that ESY was not required in order for the student to receive FAPE." Although the hearing officer acknowledged that "evidence does show regression in skills from time to time, and not always associated with breaks in instruction, the recoupment time required was not shown to be excessive or even consistent." Pursuant to 34 C.F.R. § 300.510(b), the ECAB conducted an impartial review, examined the entire record, and rendered an

independent decision upon completion of the review.[7] The ECAB concluded that the District improperly refused to provide ESY for Jason for the summer after the 1996-97 school year because (1) the District required complete mastery of skills before a student would qualify for ESY and (2) the District failed to collect (or, in the alternative, it destroyed) raw data on regression and recoupment, in violation of several Kentucky statutes. We find that the ECAB erred by ignoring the clear mandate we issued in *Cordrey* that it is the proponent of ESY that bears the burden of proof either through the use of data or the use of expert testimony. Although we agree with the ECAB that the District should not be rewarded for not accumulating data,[8] we find it significant that the legislature did not deem it necessary to punish this conduct by automatically imposing an obligation to provide ESY for every affected student. Jason's parents could have established the need for ESY through the use of expert testimony, but, as explained below, they did not. We further note that even if Jason's parents could have established the need for ESY, the record clearly shows that the Bancroft program did not provide services that would qualify as ESY.

With respect to the need for ESY for the 1997-98 school year, the hearing officer found that "[i]t is not necessary to

---

[7] The Third Circuit interpreted the regulation to mean that:
[A]ppeals panels reviewing the fact findings of hearing officers . . . exercise plenary review, except that they should defer to the hearing officer's findings based upon credibility judgments unless the non-testimonial, extrinsic evidence in the record would justify a contrary conclusion or unless the record read in its entirety would compel a contrary conclusion.
*Carlisle Area Sch. v. Scott P.*, 62 F.3d 520, 529 (3d Cir. 1995).

[8] If the question of data accumulation becomes important on remand, there is testimony from Mr. Burdge that such data was in fact collected and provided to the parents. J.A. at 1347-52. *See also* J.A. at 222-23.

address the appropriateness of the summer program at Chileda; while it may have been of value to the student, there is no evidence that his IEP was not appropriate to the needs of the student, or that ESY services were required in order for the student to receive a FAPE." Once again, the ECAB disagreed:

> The parent's placement at Chileda for the Summer of 1998 was reasonable, given the testimony by LEA [local educational agency's] employees that behavioral issues adversely affected the student's ability to participate in his educational program and that his behavior would deteriorate without structure. An expert from Bancroft, who had personally assessed and worked with the student, testified that in his opinion the student needs structure all the time. Another expert, a clinical psychologist who evaluated the student, testified that he needs a highly structured, uninterrupted flow of services throughout the year and that without such services, the student would inevitably suffer significant regression.

J.A. at 90. The clinical psychologist referred to by the ECAB was Dr. Ebbens and it is his testimony that we now turn to. Dr. Ebbens evaluated Jason on February 6, 2001, more than a year after all relevant decisions by the District had been made in this case. Dr. Ebbens was asked on direct examination to explain why in his opinion it was "important that services for Jason have no interruption throughout the year?" Dr. Ebbens answered:

> I've worked with developmentally delayed kids and adults throughout my years even beginning in undergraduate training. I've consulted with a lot of TBI or traumatic brain injury programs. Almost invariably what happens if you don't provide that constant flow of services, that there's going to be regression and significant regression. The way these kinds of individuals process information, without that flow not

only will there be regression, but there's going to be a considerable amount of time before they can catch up. Let's say they leave the program for a few months or the residential facility or wherever they might be. There is going to be a considerable amount of time before they can get back up to that level where they had been. People with traumatic brain injury or severe developmental delays, they tend to be very concrete, very obsessional. If they're not hooked in on a program, then that's going to affect that whole process or rehabilitation basically.

J.A. at 181-82. Dr. Ebbens was also asked what his opinion was "regarding regression for Jason Hunt." He answered "[m]y opinion would be if you were to take him out of a full-time, intense comprehensive program, that it is inevitable that he would regress and quite significantly." J.A. at 182. We find this testimony inadequate to meet the high burden that the *Cordrey* court imposed on those who propose an ESY for inclusion in the child's IEP. In other words, there was no demonstration, "*in a particularized manner relating to the individual child*, that an ESY is necessary to avoid something more than adequately recoupable regression." *Cordrey*, 917 F.2d at 1473. Dr. Ebbens could only opine, based on his experience with individuals similar to Jason, that it would take two months or more for Jason to recoup what he would lose without ESY. This opinion was not particularized nor did it explain whether two months is or is not an adequately recoupable regression.[9] As the *Cordrey* court noted:

---

[9]The district court relied on two other experts to support its finding. Gil Damon, a Behavioral Team Leader at the Bancroft Center, testified at the due process hearing that Jason needed a structured environment year round. J.A. at 1745-46. Sheri Carlson, the Director of Behavior at the Chileda Institute, testified that Jason would need between one month and six weeks to recover from regression suffered during the summer break. J.A. at 1687-88. The opinions of those two experts suffer from the same infirmity as that of Dr. Ebbers–they merely point out that Jason would

"Plaintiff's parents are seeking an ideal education for their child. Their aspirations are understandable, even admirable. But neither they nor any other parents have the right under the law to write a prescription for an ideal education for their child and to have the prescription filled at public expense." *Cordrey*, 917 F.2d at 1474 (citation omitted).

With respect to FAPE for the 1998-2000 school years, the hearing officer found that the record did not "present evidence, other than parent opinion, that the IEP developed on September 16, 1998, did not provide FAPE" for Jason. J.A. at 49. The hearing officer noted that "[t]he parents were active participants in the educational planning for their child. They did not like some aspects of the program, but they did not substantiate that the IEP was not reasonably designed to provide benefit." *Id.* The hearing officer also found that the "school district had no opportunity, need or obligation to develop an IEP for the student for the 1999-2000 school year, as he was not enrolled in the district." J.A. at 51. Finally, the hearing officer found that the District did not fail to provide adequate FAPE with their IEP for the summer of 2000 because an "appropriate ESY program was offered by the District and the parents refused to accept anything less than a full-time replication of the Chileda IEP. That is certainly the right of the parents, but the school district is not obligated to fund the parent's chosen placement." J.A. at 55. Once again, the ECAB disagreed with all aspects of the hearing officer's decision. It found that parents felt that they had to sign a one-year contract with Chileda in order to receive any

---

regress over the summer. However, as pointed out above, to obtain ESY, a plaintiff must show that his regression would be greater than that of a normal child. The District, on the other hand, presented Mr. Burdge's testimony that the general recoupment time for a normal, "unhandicapped" child was eight weeks. J.A. at 1346. The eight-week "typical" regression is actually less than Ms. Carlson's estimate for Jason's regression. Plaintiffs offered no reason to discredit that aspect of Mr. Burdge's testimony.

services for Jason at all.  It then noted that it had earlier, J.A. at 82-6, concluded that the District failed to provide FAPE to Jason for any of the years in question.[10]  It also found that Chileda was appropriate for Jason.  The ECAB continued:

> Having concluded that the IEPs of the [District] were not appropriate and that the placement of the parent *was* appropriate we must still balance the equities in this case. While we acknowledge that the parents were active participants in the educational process of this child, and the mother regularly attended ARC meetings, the parents are not educators and cannot be responsible for knowing how an IEP or behavior plan should be written and implemented. . . . We find that all of these factors, taken together, tip the balance in favor of awarding reimbursement to the parents, even for residential placement.

J.A. at 91.  We understand the plight of Jason's parents and we understand the ECAB's willingness to extend its sympathy to them.  We cannot, however, condone an imposition of a "heavy financial drain upon the public fisc," *Cordrey*, 917 F.2d at 1473, in circumstances such as these. Jason's parents have closely supervised his development since his birth; they have sent him to numerous schools; they have monitored his progress; they discussed all matters pertaining to his education with personnel inside and outside the District; and they even hired an attorney to represent them. Although we agree that they are not educators, that fact alone is not dispositive here.  Jason's parents want the best for their child.  It is a commendable desire.  However, we stress that "an appropriate education is not synonymous with the best possible education. . . . It is also not education which enables a child to achieve his full potential; even the best public

---

[10]This appears to be the first time that the adequacy of FAPE actually became an ESY issue.

schools lack the resources to enable every child to achieve his full potential." *Cordrey*, 917 F.2d at 1474.  The ECAB noted a number of issues that were not addressed in the IEPs.[11] However, the District's resources are limited (both in terms of time and money), and it must make a decision on how to balance all of the conflicting needs of a child such as Jason. The District had decided on a proper course of action with the input and consent of Jason's parents.  The District thus fulfilled its legal obligation to Jason.  While Jason's parents

---

[11]It is also important that although the ECAB identified a number of problems with IEPs preceding the 1998-2000 school years, those problems, if they existed, had nothing to do with whether or not Jason was entitled to ESY for school years before 1998.  Nor is it of any relevance to whether Jason's parents were justified in making a placement at Chileda in the spring of 1999.  The only relevant IEPs are those starting with the IEP dated September 16, 1998.  The ECAB identified the following faults with that IEP:

> [It] says that the student will improve social competence in the area of behavior.  His short term objective is to improve behavior in the areas of transitions, work completion, behaviors re mouth, and behaviors re hands.  No information whatsoever is given to explain exactly what the student must do in order to show mastery of any of these objectives.  Daily reports received from the special education teacher provided general comments to the parents, such as "good day today" or "Wild today . . .", but these do not indicate in any way whether or not the student is progressing toward mastery of the objectives.

J.A. at 85-6.  We think that the ECAB was requiring too much from the District.  We are at a loss to understand how a school district can show a progress towards, for example, behaviors "re hands" beyond what the District stated in the IEP. J.A. at 1030.  Moreover, the White IEP is no more opaque than the Chileda IEP, which, for example, set goals for demonstrating "age-appropriate social interaction skills" and "socially appropriate behaviors in the community."  J.A. at 1137.  With respect to the IEP for the 1999-2000 school year, the ECAB acknowledged that the IEP contained prioritized goals but still found it deficient. J.A. at 86.  We agree with the hearing officer that since Jason was not a student at White during that year, his IEP for that year is irrelevant.

understandably desire more, they are not entitled to have the District pay for it.[12]

As explained above, we conclude that the ECAB and the district court erred when they determined that the 1999-2000 IEP was invalid and that Jason did not receive FAPE for the 1999-2000 school year. Accordingly, we conclude that Jason may have been offered an adequate FAPE. We also conclude that once Jason's parents rejected the District's offer and took Jason out of the school for the entire school year, he may not have been entitled to ESY for the summer of 2000.[13]

---

[12]Although we are primarily concerned with the District's inability to present evidence to the district court, we recognize that when the district court limited the length of the evidentiary hearing, Plaintiffs, as well, were prevented from presenting all the evidence they may have to support their claim. Accordingly, throughout this opinion, we comment only on evidence that is in the existing record. No portion of this opinion should be viewed as foreclosing Plaintiffs from prevailing on remand. To prevail, however, either they will have to present *additional* evidence that would address the concerns that we have expressed in this opinion or the district court must state its reasons for rejecting the testimony of Mr. Burdge.

[13]Rather than make legal findings with respect to both FAPE and ESY, we remand to the district court for further factual findings to supplement the record. We expressly note the following deficiencies in the proceedings below.

First, the district court found that the ESY proposed by the District for the summer of 2000 was inadequate because it was not proposed by an ARC. However, since Jason was not enrolled at White during 1999-2000, there was no ARC to convene. Instead, the program was constructed by an experienced teacher based on the IEP prepared at Chileda and designed for transition to middle school at Turkey Foot in the school district where Jason would be enrolled in the fall. While Chileda officials stated that the proposed program would not suffice because it ended on July 27 while the Chileda program continued until August 17, the fall school semester started in August and so there was only a slight difference in duration of the summer program. Also, while the District's proposed program was for only three days a week, Chileda's report of its summer 2000 program indicates that only three days a week were devoted

## B. *Retroactive Application of an IDEA Regulation*

It appears that in its decision, the district court applied an incorrect version of the IDEA regulations. The district court cited a version of the Kentucky Administrative Regulations that did not become effective until August 14, 2000. That date is after all the relevant developments in this case.[14] The parties do not dispute that the district court should have

---

to the academic programs because Fridays typically were community outings and Wednesdays were swim days. Furthermore, Jason also missed a week while attending camp from August 7 through 11. J.A. at 186

Second, neither the ECAB nor the district court made any finding as to whether Jason was making reasonable progress with his FAPE in the relevant years. The ECAB pointed to a lack of records, not surprising since the issue was not litigated before the hearing officer where the parents were asking for ESY and sought the 1999-2000 school years as required in order to participate in the summer program at Chileda. Both parents testified they were satisfied with Jason's academic progress at White's Tower but not his behavioral situation. At the hearing before the district court, his teacher for the 1998-99 year testified that after his return to school after his hospitalization at the Franciscan Hospital, he had only two occasions of vomiting during the remainder of his time at White's Tower, a period of several months, that his toileting was handled in much the same way as it was at Chileda, using an icon and regular reminders, and that while there were some accidents, they were few. Testing indicated that Jason progressed at about the same rate at Chileda as White's Tower. While the Chileda program may have been more effective to improve Jason's behavioral problems, defendant is not required to provide a residential program.

[14]The portion of the regulation relied upon by the district court provides:

In the case of a child whose behavior impedes his or her education or that of others, consider, if appropriate, strategies, including positive behavioral interventions, strategies, and supports to address that behavior.

707 KY. ADMIN. REGS. 1:320 § 5(2)(a)(2000). The 2000 version of the regulations is more specific with respect to what an IEP should contain than the earlier version applicable to the years in question here. (Appellee Br. at 50.)

applied the pre-2000 regulations. Rather, they dispute whether the reliance on the new regulations amounted to a harmless error. Because of our ultimate disposition of this case, we do not address this problem.

### C. *Deference to the ECAB*

The District argues on appeal that the district court improperly deferred to the ECAB instead of the hearing officer. Although it is not germane to our disposition of the case, we reiterate that federal courts defer to the final decision of the state authorities, which, in this case, means the decision of the ECAB. *See, e.g., Thomas v. Cincinnati Bd. of Educ.*, 918 F.2d 618, 624 (6th Cir. 1990); *Burilovich v. Bd. of Educ. of the Lincoln Consol. Sch.*, 208 F.3d 560, 567 (6th Cir. 2000).

### CONCLUSION

For the reasons stated above, we reverse. Because we have found that the ECAB committed a number of reversible legal errors and that the district court relied on the ECAB opinion without a full evidentiary hearing, we remand to the district court for a full hearing on the issues raised by the parties. On remand, the district court should place the burden of establishing the need for an ESY (during the summers) and a lack of FAPE (during the regular school year) on plaintiffs.